Lyndon H. LaROUCHE, Jr.,
et al., Appellants,

v.

Donald L. FOWLER, Individually and
as Chairman Democratic National
Committee, et al., Appellees.

No. 96–7191.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 14, 1997.

Decided Aug. 28, 1998.

James F. Schoener argued the cause for appellants, with whom Theo Mitchell, Odin P. Anderson, James E. Wilson, Jr. and Nina J. Ginsberg were on the briefs.

John C. Keeney, Jr. argued the cause for appellees, with whom Charles A. Rothfeld, Mary Eva Candon, John Hardin Young, Steven Ross and Richard A. Halloran were on the brief. Scott M. Deutchman entered an appearance.

Before: SILBERMAN, SENTELLE and GARLAND, Circuit Judges.

GARLAND, Circuit Judge:

This case arises out of Lyndon H. LaRouche, Jr.'s unsuccessful quest for the Democratic Party's 1996 nomination for President. The Party's application of certain of its internal rules deprived LaRouche of two delegates to the 1996 Democratic National Convention. LaRouche contends that application of those rules violated the Voting Rights Act, 42 U.S.C. §§ 1971, 1973–1973bb, because the Party did not submit them for judicial or administrative preclearance. He also contends that application of the rules violated his rights under the Constitution. With a limited exception, we conclude that we are without jurisdiction to decide LaRouche's Voting Rights Act claims and therefore remand them for the convening of a three-judge district court. We affirm the dismissal of LaRouche's constitutional claims.

**I**

LaRouche declared his candidacy for the Democratic Party's 1996 nomination for President on August 7, 1993. On March 12, 1994, the Democratic National Committee (DNC) adopted its Delegate Selection Rules for the 1996 Democratic National Convention. Rule 11(K) provided:

For purposes of these rules, a Democratic candidate for President must be registered to vote, must be a declared Democrat, and must, as determined by the Chairman of the Democratic National Committee, have established a bona fide record of public service, accomplishment, public writings and/or public statements affirmatively demonstrating that he or she has the interests, welfare and success of the Democratic Party of the United States at heart and will participate in the Convention in good faith.

In January 1995, the DNC adopted the "Call to the 1996 Democratic National Convention," which in Article VI defined "presidential candidate" as:

any person who, as determined by the National Chairperson of the Democratic National Committee, has accrued delegates in the nominating process and plans to seek the nomination, has established substantial support for his or her nomination as the Democratic candidate for the Office of the President of the United States, is a bona fide Democrat whose record of public service, accomplishment, public writings and/or public statements affirmatively demonstrates that he or she is faithful to the interests, welfare and success of the Democratic Party of the United States, and will participate in the Convention in good faith.

By the spring of 1996, LaRouche had qualified for a position on the Democratic Party primary ballot in numerous states. On January 5, 1996, however, before the first primary was held, DNC Chairman Donald L. Fowler issued a letter addressed to the chairpersons of all state Democratic Party organizations. Expressly exercising his authority under Rule 11(K) and Article VI (hereinafter "Rule 11(K)" or "the Rules"), Fowler determined that:

Lyndon Larouche [sic] is not a bona fide Democrat and does not possess a record affirmatively demonstrating that he is faithful to, or has at heart, the interests, welfare and success of the Democratic Party of the United States. This determination is based on Mr. Larouche's expressed

political beliefs, including beliefs which are explicitly racist and anti-Semitic, and otherwise utterly contrary to the fundamental beliefs ... of the Democratic Party and ... on his past activities including exploitation of and defrauding contributors and voters.

Following this determination, Fowler instructed the state parties that:

Accordingly, Mr. Larouche [sic] is not to be considered a qualified candidate for nomination of the Democratic Party for President.... Therefore, state parties ... should disregard any votes that might be cast for Mr. Larouche, should not allocate delegate positions to Mr. Larouche and should not recognize the selection of delegates pledged to him at any stage of the Delegate Selection Process.

Further, Mr. Larouche will not be entitled to have his name placed in nomination for the office of President at the 1996 Democratic National Convention. No certification of a delegate pledged to [him] will be accepted by the Secretary of the DNC....

Neither the Rules nor the Fowler letter were submitted to the Attorney General or a district court for preclearance under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c.

LaRouche was not excluded from any primary ballot because of Fowler's letter. He appeared on Democratic Party primary ballots in twenty-six states, receiving a total of 597,853 votes. He alleges [1] that under the otherwise operative party rules, he won sufficient support in Louisiana's Democratic Party primary and in Virginia's Democratic Party caucuses to be entitled to one national convention delegate from each state. The respective state party chairpersons, however, carried out the instructions in the Fowler letter and ruled that LaRouche was not entitled to the two delegates. In addition, LaRouche asserts that local precinct delegates pledged to him were excluded from Texas Democratic Party caucuses. And although Arizona's Secretary of State certified LaRouche's name for that State's "presidential

---

1. Because the district court dismissed LaRouche's complaint for failure to state a claim, we must deem the allegations of the complaint to be true. *See Goosby v. Osser*, 409 U.S. 512, 521 n. 7, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973).

preference election," the Arizona State Democratic Party filed a lawsuit in state court that resulted in the cancellation of that election.[2] Finally, LaRouche asserts that the District of Columbia Democratic Party refused to accept the candidacy of delegates pledged to him.

On August 2, 1996, less than one month before the Democratic National Convention, LaRouche, would-be LaRouche delegates, and LaRouche supporters who either voted for him in primaries and caucuses or assertedly were barred from doing so (collectively referred to in this opinion as "LaRouche") filed suit in the District Court for the District of Columbia against Fowler, the DNC, and state Democratic Party officials and organizations in Arizona, the District of Columbia, Louisiana, Texas, and Virginia (collectively referred to in this opinion as "the DNC"). The suit alleged, inter alia, the failure to pre-clear changes in voting procedures in violation of the Voting Rights Act, as well as the violation of rights guaranteed by the Constitution and 42 U.S.C. § 1983. LaRouche sought compensatory and punitive damages, declarations that the DNC rules and Fowler's actions were void for lack of preclearance and were unconstitutional, and injunctions ordering defendants to seat his delegates at the convention and prohibiting the DNC from reenacting Rule 11(K) or any similar rule for future conventions. LaRouche also sought the appointment of a three-judge district court to hear the case, pursuant to section 5 of the Voting Rights Act and 28 U.S.C. § 2284.

On August 15, 1996, the district court denied the application for a three-judge court and dismissed the entire complaint, with prejudice as to all defendants, pursuant to Fed.R.Civ.P. 12(b)(6). The court ruled that "[n]ot only has the U.S. Supreme Court held that the national political parties possess the right under the First Amendment to 'identify' those who constitute their 'association' and to 'limit the association to those people only,' the only defendants able to afford the relief sought, viz., Chairman Fowler and the DNC, are neither 'covered jurisdictions' nor agents thereof under ... the Voting Rights Act and, thus, not subject to its 'preclearance' requirements."

## II

Before reaching the merits of LaRouche's claims, we must first consider defendants' contention that those claims are moot because the 1996 election is over. LaRouche does not dispute the mootness of his specific request for an injunction ordering the seating of his delegates at the 1996 Convention, but contends that his underlying causes of action continue to present a live controversy. He is plainly correct as to his claims under the Constitution and § 1983, because his request for damages on those claims saves them "from the bar of mootness." *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 8, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978). Although the DNC contends that a claim for damages can keep a controversy alive only if that claim "is not so insubstantial or so clearly foreclosed by prior decisions that th[e] case may not proceed," Appellees' Br. at 14 (quoting *Memphis Light,* 436 U.S. at 9, 98 S.Ct. 1554), as the discussion in Part V of this opinion makes clear, those claims are neither insubstantial nor foreclosed by prior decisions.[3]

---

2. Arizona's state-run "presidential preference election" had been scheduled for February 27, 1996, while DNC rules precluded participation in primaries before March 5. The Democrats in Arizona accordingly planned their own party-run primary for March 9 and sued to block the state-run primary. Despite LaRouche's objections, an Arizona state court blocked the state primary, noting in the process that the DNC had found LaRouche not to be a qualified candidate for the Democratic Party nomination. *See Arizona State Democratic Comm. v. Secretary of State,* No. CV96–00909, slip op. at 5 (Ariz.Super. Ct., Maricopa Co. Feb. 1, 1996) (Joint Appendix ("J.A.") at 346).

3. Although in Part V we assume without deciding that LaRouche is correct in his contention that the conduct he challenges constitutes state action, Part V.A makes clear that contention is neither "insubstantial" nor "clearly foreclosed by prior decisions." We also note that the quoted phrase from *Memphis Light* appears to describe the test for subject matter jurisdiction rather than a requirement for avoiding mootness. *Cf. Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 90 L.Ed. 939 (1946) (holding that claims may be dismissed for want of jurisdiction if "wholly insubstantial and frivolous").

■ We also agree with LaRouche that both these and his other claims are saved from mootness because the situation is "capable of repetition, yet evading review." This exception to the mootness doctrine applies if: "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration[;] and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again...." *Spencer v. Kemna*, ——— U.S. ———, ———, 118 S.Ct. 978, 988, 140 L.Ed.2d 43 (1998) (citation and internal quotation omitted); *see Lewis v. Continental Bank Corp.*, 494 U.S. 472, 481, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). Challenges to rules governing elections are the archetypal cases for application of this exception. *See, e.g., Norman v. Reed*, 502 U.S. 279, 287–88, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992); *Rosario v. Rockefeller*, 410 U.S. 752, 756 n. 5, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973); *Moore v. Ogilvie*, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *see also Branch v. FCC*, 824 F.2d 37, 41 n. 2 (D.C.Cir.1987) ("Controversies that arise in election campaigns are unquestionably among those saved from mootness under the exception for matters 'capable of repetition, yet evading review.' "); *Stewart v. Taylor*, 104 F.3d 965, 969 (7th Cir.1997) ("[E]lections are routinely too short in duration to be fully litigated, and there is a reasonable expectation that the same party would be subjected to the same action again."); *New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 18 (1st Cir.1996).

■ Under the "evading review" prong of this exception, we consider "whether the challenged activity is *by its very nature short in duration*, so that it could not, or probably would not, be able to be adjudicated while fully live." *Conyers v. Reagan*, 765 F.2d 1124, 1128 (D.C.Cir.1985) (internal quotations omitted). The DNC contends that LaRouche had ample time to seek judicial review because Rule 11(K) was adopted in March 1994, over two years before the convention. In support, it cites our statement in *National Black Police Ass'n v. District of Columbia* that " 'both Supreme Court and circuit precedent hold that orders of less than two years' duration ordinarily evade review.' " 108 F.3d 346, 351 (D.C.Cir.1997) (quoting *Burlington*

*Northern R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 690 (D.C.Cir.1996)). This two-year mark, however, serves only as a rule-of-thumb; we did not intend it to exclude periods of slightly greater duration, as in this case.

Moreover, the date of the adoption of Rule 11(K) is not the critical date. Indeed, had LaRouche sued as soon as the DNC adopted the rule, his claims might well have been declared unripe, as the rule did not mention LaRouche at all. The Party gave no indication that it would apply the rule to LaRouche until January 1996, just seven months prior to the convention, a time certainly too short to permit district court challenge and appellate review. *See Burlington Northern R.R. Co.*, 75 F.3d at 690.

LaRouche's challenge also satisfies the "capable of repetition" prong of the exception, as "there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again...." *Spencer*, 118 S.Ct. at 988 (citation and internal quotation omitted). LaRouche has sought the Democratic Party's presidential nomination in the past five elections. He received over half a million votes during the 1996 primaries. And on July 18, 1997, he announced his "intention to campaign for the Year 2000 Democratic Party presidential nomination." Addendum to Appellants' Br. at 57.

Defendants contend that it is "pure speculation" whether the DNC will adopt a rule similar to Rule 11(K) for the 2000 Convention, or whether the DNC chair will apply any such rule to LaRouche. But the Party "has not disavowed" that it will do so. *Cf. Morse v. Republican Party*, 517 U.S. 186, 116 S.Ct. 1186, 1213 n. 48, 134 L.Ed.2d 347 (1996) (Stevens, J.) (fact that Virginia Republican Party "ha[d] not disavowed" practice of imposing a delegate filing fee for its nominating convention was important factor in concluding that controversy was capable of repetition, yet evading review). Moreover, given the party-defining importance the DNC's briefs attach to Rule 11(K), there is at least a "reasonable expectation" that it or something close to it will be in place for the next convention. And given the vehe-

mence of DNC Chairman Fowler's attack on LaRouche's credentials as a "bona fide Democrat," there certainly is a "reasonable expectation" that future Party chairs will see matters the same way.

Finally, we reject defendants' argument that *Keane v. National Democratic Party,* 475 F.2d 1287 (D.C.Cir.1973), establishes that the "capable of repetition, yet evading review" exception does not apply to "a post-convention ... challenge to credentials of party-selected delegates to a Democratic National Convention." Appellees' Br. at 10. *Keane* did conclude that by 1973, a challenge to the exclusion of delegates from the 1972 Democratic National Convention was moot to the extent it involved the right to be seated at the convention (although not moot to the extent it involved the right of competing delegates to post-convention representation in national party matters). *See Keane,* 475 F.2d at 1288. But while the dissenting judge protested that the case was capable of repetition, the majority did not mention the exception at all. Indeed, nothing in the majority opinion suggests that the delegates in *Keane* could have demonstrated, as LaRouche can, that they reasonably expected to be subjected to the same action again.

Accordingly, we conclude that *Keane* does not preclude application of the capable of repetition exception to the facts of this case. To the contrary, because "[t]here [is] every reason to expect the same parties to generate a similar, future controversy subject to identical time constraints if we should fail to resolve the ... issues that arose" in 1996, we reject defendants' effort to raise the bar of mootness. *See Norman,* 502 U.S. at 288, 112 S.Ct. 698 (holding that Illinois court's decision voiding use of party label in past election was capable of repetition, yet evading review).

### III

We turn next to defendants' contention that challenges to party delegate-selection rules constitute nonjusticiable political questions. Although this court twice before has rejected that contention, *see Bode v. National Democratic Party,* 452 F.2d 1302, 1305 (D.C.Cir.1971); *Georgia v. National Democratic Party,* 447 F.2d 1271, 1276–78 (D.C.Cir.1971), the DNC argues that *O'Brien*

*v. Brown,* 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972), subsequently established that all disputes over internal party rules are nonjusticiable. But *O'Brien* did not set forth such a broad rule; indeed, *O'Brien* did not even decide the applicability of the nonjusticiability doctrine to the case then before the Court.

In *O'Brien,* the Supreme Court considered challenges to judgments of this court passing upon the constitutionality of delegate-seating determinations made by the Democratic Party's Credentials Committee in advance of the 1972 national convention. The Court noted that "these cases involve claims of the power of the federal judiciary to review actions heretofore thought to lie in the control of political parties," that "[h]ighly important questions are presented concerning justiciability," and that it "entertain[ed] grave doubts as to the action taken by the Court of Appeals." *Id.* at 4–5, 92 S.Ct. 2718. As the dispute had not reached the Supreme Court until the eve of the convention, however, the Court pronounced itself "unwilling to undertake final resolution of the important constitutional questions presented .... under the circumstances and time pressures surrounding" the appeals, *id.,* and instead simply granted stays of the judgments pending consideration of the petitions for certiorari.

The defendants also contend that, since *O'Brien,* the Supreme Court has consistently held "disputes over internal party rules to be nonjusticiable." Appellees' Br. at 22. In fact, the Court has never so held. The first case defendants cite for this proposition is *Cousins v. Wigoda,* which did hold that "[t]he National Democratic Party and its adherents enjoy a constitutionally protected right of political association." 419 U.S. 477, 487, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975). But that did not end the inquiry. The Court went on to determine whether Illinois had a sufficiently "compelling interest" to justify abridgment of the Party's constitutional rights, *id.* at 489–91, 95 S.Ct. 541, and expressly "intimate[d] no views" as to "whether or to what extent principles of the political question doctrine counsel against judicial intervention" into "decisions of a national polit-

ical party in the area of delegate selection," *id.* at 483 n. 4, 95 S.Ct. 541.[4]

Much the same is true of the other Supreme Court decisions cited by defendants, including *Democratic Party v. Wisconsin ex rel. LaFollette*, 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981), *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989), and *Tashjian v. Republican Party*, 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). As defendants contend, and as we will discuss in Part V below, these cases do hold that "a State, or a court, may not constitutionally substitute its own judgment for that of [a] Party. A political party's choice among the various ways of determining the makeup of a State's delegation to the party's national convention is protected by the Constitution." *LaFollette*, 450 U.S. at 123–24, 101 S.Ct. 1010. Yet, as in *Cousins*, in each of these cases the Court went on to decide the dispute on the merits. And in *LaFollette*, although the Court said that "the stringency, and wisdom, of membership requirements is for the association and its members to decide—not the courts," it immediately qualified that statement by adding: "*so long as*

those requirements are otherwise constitutionally permissible." *Id.* at 123 n. 25, 101 S.Ct. 1010 (emphasis added).[5]

The allegations made by LaRouche do not come within the basic criteria for political questions. For example, "[a] controversy is non-justiciable—i.e., involves a political question—where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it....'" *Nixon v. United States*, 506 U.S. 224, 228, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (quoting *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). The first category of political questions is plainly absent here, as no other branch of the government is involved. The important question is whether this case falls within the second category—that is, whether there are judicially discoverable and manageable standards for resolving it.

Contrary to defendants' description, this case does not come to us merely as a dispute over whether LaRouche qualifies for delegates under internal party rules. Rather,

---

**4.** *Cousins*, *O'Brien*, and *Keane* all related to a dispute over the seating of Illinois delegates at the 1972 convention. In the Illinois state primary, voters elected a slate of uncommitted delegates, including Chicago alderman Paul Wigoda, who were associated with Chicago Mayor Richard J. Daley. A "reform" slate, including William Cousins, successfully petitioned the Party's Credentials Committee to be seated in their stead. *See generally* Petitioners' Opening Brief at 5–9, *Cousins v. Wigoda*, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975) (No. 73–1106). The Wigoda delegates, in turn, sued to reverse the Committee's decision.

In *Brown v. O'Brien*, 469 F.2d 563 (D.C.Cir. 1972), this court rejected the Wigoda delegates' complaint and enjoined them from further prosecuting an Illinois state court action they had brought against their rivals. *See id.* at 571–75; *see also infra* note 20. In *O'Brien v. Brown*, the Supreme Court stayed this court's judgment. *See* 409 U.S. at 5, 92 S.Ct. 2718. After the convention, the Court granted the petition for certiorari, vacated the judgment, and remanded for consideration of whether the case had become moot. *See Keane v. National Democratic Party*, 409 U.S. 816, 93 S.Ct. 67, 34 L.Ed.2d 73 (1972). We held the case moot insofar as it concerned the seating of delegates at the convention, and affirmed dismissal of the Wigoda delegates' suit. *See Keane*, 475 F.2d at 1288.

Meanwhile, one day after the Supreme Court's stay of our initial judgment, and two days before the convention, the Illinois circuit court had ruled in favor of the Wigoda delegates and enjoined the Cousins delegates from participating in the convention. *See Cousins*, 419 U.S. at 480, 95 S.Ct. 541. The convention nevertheless seated the Cousins delegates, who were subsequently threatened with criminal contempt for violating the state court injunction. *See id.* at 481, 95 S.Ct. 541. In *Cousins*, the Supreme Court reversed the decision of the Illinois court in favor of the Wigoda delegates. *See id.* at 491, 95 S.Ct. 541.

**5.** In *Wymbs v. Republican State Executive Committee*, also cited by defendants, the Eleventh Circuit held nonjusticiable a challenge to Florida Republican Party rules for selection of delegates to the 1980 Republican National Convention. *See* 719 F.2d 1072 (11th Cir.1983). The court's holding was based in part on the fact that, in contrast to this case, plaintiffs had failed to join the Party's national committee as a defendant. *See id.* at 1081, 1086; *see also Bachur v. Democratic Nat'l Party*, 836 F.2d 837, 838, 841 (4th Cir.1987) (deciding that a constitutional challenge to 1984 Democratic National Convention rules, as implemented in Maryland, was "not justiciable *because it is lacking in merit*") (emphasis added).

LaRouche contends that the Party's internal rules violate the Voting Rights Act. In so doing, he alleges the violation of an express and measurable statutory duty requiring covered "state[s] or political subdivision[s]" to preclear "any voting qualification . . . or procedure with respect to voting different from that [previously] in force or effect. . . ." 42 U.S.C. § 1973c. Although it may be difficult to determine whether Rule 11(K) comes within the Act's terms, courts do not lack judicially discoverable and manageable standards for making that determination. The application of the Voting Rights Act's language to the facts of the Party's delegate-selection rules is a typical judicial exercise. As we will discuss in detail below, it is an exercise the Supreme Court itself undertook just two Terms ago—without raising the specter of a political question. *See Morse,* 517 U.S. 186, 116 S.Ct. 1186, 134 L.Ed.2d 347.

Nor do the plaintiffs' constitutional (and § 1983) claims raise a political question. Those claims arise principally under the First Amendment and under the Equal Protection and Due Process Clauses of the Fourteenth Amendment. The Supreme Court repeatedly has adjudicated election disputes arising under those amendments, *see, e.g., Eu,* 489 U.S. at 222–33, 109 S.Ct. 1013; *LaFollette,* 450 U.S. at 120–26, 101 S.Ct. 1010; *Cousins,* 419 U.S. at 487–91, 95 S.Ct. 541, thus rendering "the interpretation of [these] provisions of the Constitution . . . well within the competence of the Judiciary," *United States Dep't of Commerce v. Montana,* 503 U.S. 442, 458, 112 S.Ct. 1415, 118 L.Ed.2d 87 (1992) (referring to "the apportionment provisions of the Constitution"). *See Williams v. Rhodes,* 393 U.S. 23, 28, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (rejecting claim that challenge to state election law was nonjusticiable political question). Although defendants seek to distinguish the election cases as involving "state action," while contending that this case involves nothing more than the decisions of a private political party, determining which of those two descriptions is legally correct is part of deciding whether the DNC's actions violate the Constitution. And "[t]hat determination is a decision on the merits that reflects the exercise of judicial review, rather than the abstention from judi-

cial review that would be appropriate in the case of a true political question." *Montana,* 503 U.S. at 458, 112 S.Ct. 1415.

## IV

We next consider LaRouche's challenge to the district judge's determination that Rule 11(K) and the Fowler letter did not violate the Voting Rights Act. We conclude that both this court and the single-judge district court below largely lack jurisdiction to decide the merits of this issue because the question properly belongs before a three-judge district court. *See Goosby v. Osser,* 409 U.S. 512, 522 n. 8, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973).

## A

■ Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, states that "[a]ny action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28." Section 2284(b)(1), in turn, provides that the district judge to whom a request for a three-judge court is made "shall, unless he determines that three judges are not required," notify the chief judge of the circuit to convene a three-judge court. Appeals from decisions of three-judge courts under section 5 must be made directly to the Supreme Court. *See* 42 U.S.C. § 1973c; *Allen v. State Bd. of Elections,* 393 U.S. 544, 561–62, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). Courts of appeals, however, have jurisdiction to determine whether a single district judge properly declined to convene a three-judge court. *See Gonzalez v. Automatic Employees Credit Union,* 419 U.S. 90, 100 & n. 19, 95 S.Ct. 289, 42 L.Ed.2d 249 (1974); *Idlewild Bon Voyage Liquor Corp. v. Epstein,* 370 U.S. 713, 715–16, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962); H.R. REP. No. 94–1379, at 7 (1976).

■■ It has long been the rule that single district judges may not determine the merits of claims alleging the failure to preclear voting changes under section 5. *See, e.g., Backus v. Spears,* 677 F.2d 397, 400 (4th Cir.1982); *United States v. Saint Landry Parish Sch. Bd.,* 601 F.2d 859, 863 (5th Cir.

1979); *cf. Goosby,* 409 U.S. at 518, 93 S.Ct. 854 (regarding three-judge court actions under former 28 U.S.C. § 2281). Although § 2284 does provide that a single judge may "determine[ ] that three judges are not required," 28 U.S.C. § 2284(b)(1), a single judge may do so only if a plaintiff's challenge is "wholly insubstantial," *League of United Latin Am. Citizens v. Texas,* 113 F.3d 53, 55 (5th Cir.1997) (quoting *Goosby,* 409 U.S. at 518, 93 S.Ct. 854). *See also Backus,* 677 F.2d at 400. The Supreme Court made clear just how minimal a showing is required to establish substantiality in *Goosby v. Osser:*

> "[I]nsubstantiality" for this purpose has been equated with such concepts as "essentially fictitious," "wholly insubstantial," "obviously frivolous," and "obviously without merit." The limiting words "wholly" and "obviously" have cogent legal significance. In the context of the effect of prior decisions upon the substantiality of constitutional claims, those words import that claims are constitutionally insubstantial only if the prior decisions inescapably render the claims frivolous; previous decisions that merely render claims of doubtful or questionable merit do not render them insubstantial.... A claim is insubstantial only if its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy.

409 U.S. at 518, 93 S.Ct. 854 (citations and some internal quotations omitted).[6]

Although the DNC contends LaRouche's challenge fails even under the *Goosby* standard, it also contends that standard was altered when Congress amended § 2284 in 1976. It points out that the pre–1976 version provided that "[a] single judge shall not ... dismiss the action," 28 U.S.C. § 2284(5) (1970) (repealed 1976), while the current version does not. The DNC concludes that Congress must have meant, by this deletion, to permit a single judge to grant a motion to dismiss.

No court has noticed the language change pointed to by the DNC or interpreted it as having such import. *See League of United Latin Am. Citizens,* 113 F.3d at 55 (continuing to apply *Goosby* test); *Armour v. Ohio,* 925 F.2d 987, 989 (6th Cir.1991) (same); *Backus,* 677 F.2d at 400 (same). There is good reason for this. First, the legislative history suggests that Congress did not intend the change to have any substantive effect.[7] Second, the section of the statute in which the quoted provision appeared applied only to the powers available to an individual judge who was a member of a three-judge court, not to the powers of a single judge before such a court had been convened. *See* 28 U.S.C. § 2284(5) (1970) (repealed 1976). Third, at the same time Congress deleted the bar against a single member of a three-judge court alone "dismiss[ing an] action," it inserted a new prohibition barring such a single judge from "enter[ing] judgment on the merits," 28 U.S.C. § 2284(b)(3) (1994). Hence, at most the change merely clarified that an individual member of a three-judge court has

---

**6.** *Goosby* involved a challenge to state election laws under the Equal Protection and Due Process Clauses of the Fourteenth Amendment, which at the time had to be made before a three-judge district court pursuant to 28 U.S.C. § 2281. Congress repealed 28 U.S.C. § 2281 in 1976, returning jurisdiction over suits to enjoin state statutes on constitutional grounds to single district judges. *See* Act of August 12, 1976, Pub.L. No. 94–381, 90 Stat. 1119. The courts uniformly have applied *Goosby*'s "wholly insubstantial" standard to requests for three-judge courts under section 5 of the Voting Rights Act. *See, e.g., League of United Latin Am. Citizens,* 113 F.3d at 55; *Saint Landry Parish,* 601 F.2d at 863 n. 6; *see also Backus,* 677 F.2d at 400. Indeed, section 5 refers to the same statutory section that § 2281 did for the procedures governing its three-judge courts, providing, as did § 2281, that

actions shall be "determined by a [district] court of three judges [under] section 2284." 42 U.S.C. § 1973c; *see* 28 U.S.C. § 2281 (1970) (repealed 1976).

**7.** Although the legislative history does not address this change specifically, both the Senate and House Reports explain the reasons for other changes in the section and then note that "[t]he other powers here given the single judge, or expressly denied him, are similar to those stated in" the predecessor version of § 2284. S. Rep. No. 94–204, at 13 (1975); H.R. Rep No. 94–1379, at 7. The legislative history also states that the "bill in no way affects the right to a three-judge court where otherwise specifically mandated by statute, such as in ... the Voting Rights Act of 1965...." H.R. Rep. No. 94–1379, at 2; *see* S. Rep. No. 94–204, at 2.

no more power to decide a case on the merits than a single judge has under *Goosby*: neither may enter judgment on the merits of a claim requiring action by a three-judge court, i.e., a claim that is not "wholly insubstantial" or "obviously frivolous."

**B**

■ We turn, then, to the DNC's fall-back position: that even under *Goosby*, LaRouche's section 5 claim must be dismissed because that section's preclearance requirements "obviously" do not apply to defendants' actions. In so doing, we say only enough to determine whether LaRouche's claims are "obviously frivolous" or "wholly insubstantial," and not to intimate a final view as to their merits.

The purpose of the Voting Rights Act was to remedy "racial discrimination in voting ... in areas where such discrimination had been most flagrant." *Morse*, 517 U.S. at 191–93, 116 S.Ct. at 1192 (Stevens, J.). To that end, section 5 bars certain covered "state[s] or political subdivision[s]" from "enact[ing] or seek[ing] to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" different from that in effect on November 1, 1964, or two specified later dates, unless they have been precleared by the Attorney General or approved by the United States District Court for the District of Columbia. 42 U.S.C. § 1973c; *see Morse*, 517 U.S. at 193–95, 116 S.Ct. at 1193 (Stevens, J.).[8] Section 14 defines "vote" or "voting" as "all action necessary to make a vote effective in any primary, special, or general election" for "candidates for public *or party office*." 42 U.S.C. § 1973*l* (c)(1) (emphasis added).

Section 4 of the Act authorizes the Attorney General to identify each "State or ... political subdivision of a state" in which racial discrimination in voting had occurred, pursuant to a formula set out in the section. 42 U.S.C. § 1973b(b); *see Morse*, 517 U.S. at 191–93, 116 S.Ct. at 1192. The states and political subdivisions so identified are the

"covered jurisdictions" of the Act, 28 C.F.R. § 51.4(c), and are listed in the Justice Department's regulations. *See id.* pt. 51, app. The list includes nine states and parts of seven others. Arizona, Louisiana, Texas, and Virginia are all covered jurisdictions; the District of Columbia is not. *See id.*

The leading case regarding the application of section 5 to political parties is *Morse v. Republican Party*, 517 U.S. 186, 116 S.Ct. 1186, 134 L.Ed.2d 347 (1996). In *Morse*, the Supreme Court held that the Virginia Republican Party's imposition of a registration fee on those who wished to be delegates to the Party's nominating convention for its U.S. Senate candidate was subject to preclearance under section 5. Justice Stevens announced the judgment of the Court in an opinion joined by Justice Ginsburg. In his view, "political parties are covered under § 5 ... insofar as the Party exercises delegated power over the electoral process," *id.* 517 U.S. at 223–25, 116 S.Ct. at 1208—that is, power " 'explicitly or implicitly granted by a covered jurisdiction,' " *id.* 517 U.S. at 193–95, 116 S.Ct. at 1193 (quoting 28 C.F.R. § 51.7). Justice Stevens found Virginia to have made such a delegation because, under the state's Electoral Code, "the nominees of the two major political parties shall automatically appear on the general election ballot," in contrast to independent candidates who have to "demonstrate their support with a nominating petition." *Id.* 517 U.S. at 195–97, 116 S.Ct. at 1194. Virginia also reserved the top two ballot positions for the major parties, leaving independents with lower listings. *See id.* 517 U.S. at 197–98, 116 S.Ct. at 1195. The consequence of this "dual regime," *id.* 517 U.S. at 195–97, 116 S.Ct. at 1194, Justice Stevens said, was that the State had delegated to the Party "the power to determine part of the field of candidates from which the voters must choose. Correspondingly, when Virginia incorporates the Party's selection, it 'endorses, adopts and enforces' the delegate qualifications set by the Party for the right to choose that nominee." *Id.* 517 U.S. at

---

**8.** The standard for preclearance by a district court is a showing that the qualification or prerequisite "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color...." 42 U.S.C. § 1973c. The Justice Department's regulations provide that "the Attorney General shall make the same determination that would be made by the [district] court in an action for a declaratory judgment." 28 C.F.R. § 51.52.

197–98, 116 S.Ct. at 1195 (quoting *Smith v. Allwright*, 321 U.S. 649, 664, 64 S.Ct. 757, 88 L.Ed. 987 (1944)).

Justice Breyer, writing for himself and Justices O'Connor and Souter, concurred in the judgment. *See id.* 517 U.S. at 233–42, 116 S.Ct. at 1213–16. His opinion emphasized the historical concerns that led to the passage of the Voting Rights Act, as exemplified by the Court's White Primary Cases, *see id.* 517 U.S. at 233–38, 116 S.Ct. at 1213–14— concerns that Justice Stevens stressed as well, *see id.* 517 U.S. at 211–17 & n. 27, 116 S.Ct. at 1202–04 & n. 27. In the first of the White Primary Cases, *Nixon v. Herndon*, 273 U.S. 536, 540–41, 47 S.Ct. 446, 71 L.Ed. 759 (1927), the Supreme Court struck down, as a violation of the Fourteenth Amendment, a Texas statute barring nonwhites like plaintiff L.A. Nixon from voting in Democratic primaries. In response, the Texas legislature authorized the executive committees of political parties to prescribe their own voter qualifications, and the state Democratic Party adopted a rule limiting its primaries to white Democrats. Nixon, once again barred from voting, challenged the Party's action, which the Court held to be state action invalid under the Fourteenth Amendment. *See Nixon v. Condon*, 286 U.S. 73, 89, 52 S.Ct. 484, 76 L.Ed. 984 (1932). The Party then implemented the same policy, albeit without statutory direction, by adopting a resolution at a state convention restricting party membership to whites. The Court struck this down as unlawful state action as well, this time under the Fifteenth Amendment, concluding that the Party's resolution constituted state action even though it was not expressly authorized by statute. *See Smith*, 321 U.S. at 664, 64 S.Ct. 757. After *Smith*, the same discriminatory policy continued to be implemented in certain Texas counties by the Jaybird Democratic Association, a voluntary organization that conducted private primary elections, the winners of which with

few exceptions ran unopposed in the Democratic Party primary and general elections that followed. Once again, the Court held this election process unconstitutional under the Fifteenth Amendment. *See Terry v. Adams*, 345 U.S. 461, 469–70, 73 S.Ct. 809, 97 L.Ed. 1152 (1953). *See generally Morse*, 517 U.S. at 211–15, 116 S.Ct. at 1202–03 (Stevens, J.).

When Congress passed the Voting Rights Act in 1965, Justice Breyer wrote, it well knew the history of the White Primary Cases. It knew that "States had tried to maintain [the] status quo through the 'all-white' primary—a tactic that tried to avoid the Fifteenth Amendment by permitting white voters alone to select the 'all-white' Democratic Party nominees, who were then virtually assured of victory in the general election." *Id.* 517 U.S. at 233–35, 116 S.Ct. at 1213 (Breyer, J.). In light of this history, Justice Breyer concluded, "to have read this Act as excluding all political party activity would have opened a loophole in the statute the size of a mountain," which it was clear Congress did not intend to do. *Id.; accord id.* 517 U.S. at 215–17, 116 S.Ct. at 1204 (Stevens, J.). He cautioned, however, that the Court should decide nothing more than the case before it because of the difficult First Amendment questions raised by applying preclearance procedures in the context of political party conventions. *See id.* 517 U.S. at 238–40, 116 S.Ct. at 1215.[9]

The result in *Morse* precludes defendants' contention that because the state party actions of which LaRouche complains occurred at party caucuses or conventions rather than at state-run party primaries, section 5 preclearance "obviously" was not required: *Morse*, too, involved a convention system. *Morse* also poses difficulties for defendants' contention that the claims against Fowler and the DNC are frivolous because neither is listed as a "covered jurisdiction" under section 5: the defendant in *Morse*, the Virginia

---

**9.** The dissenting justices concluded that the Virginia Republican Party was not a "State or political subdivision" for purposes of section 5, both as a matter of statutory construction, *see id.* 517 U.S. at 252–56, 116 S.Ct. at 1222–23 (Thomas, J., dissenting, joined by Rehnquist, C.J., and Scalia, J.), and because of the First Amendment concerns noted by Justice Breyer, *see id.* 517 U.S. at 240–42, 116 S.Ct. at 1216 (Scalia, J., dissenting, joined by Thomas, J.) ("[W]e have always treated government assertion of control over the internal affairs of political parties ... as a matter of the utmost constitutional consequence."); *id.* 517 U.S. at 248–50, 116 S.Ct. at 1220 (Kennedy, J., dissenting, joined by Rehnquist, C.J.) ("The First Amendment questions presented by governmental intrusion into political party functions are a further reason for caution. . . .").

Republican Party, also was not listed. Nor can we distinguish *Morse* on the ground that it did not concern delegates to a national political convention: as Justice Stevens noted, "[t]he impetus behind the addition of the term 'party office' to § 14 was the exclusion of blacks from the Mississippi delegation to the National Democratic Convention in 1964." *Id.* 517 U.S. at 217–21, 116 S.Ct. at 1205–06; *accord id.* 517 U.S. at 235–38, 116 S.Ct. at 1214 (Breyer, J.).[10]

Finally, defendants contend that *Morse* can be distinguished as a case involving *state* party rules, while the case before us involves *national* party rules. The DNC, they say, was not acting under the authority of a covered jurisdiction when it adopted Rule 11(K); it was acting under its own authority. Likewise, defendants say, the state parties were not acting under state authority when they excluded LaRouche delegates; they were acting under the compulsion of the national party's rules. The problem with labeling this distinction as "obvious" is that a similar one was considered and rejected in *Morse*. Virginia had not required the party to enact a filing fee or even to nominate its candidates in any particular way; those decisions were the party's own. Yet, Justice Stevens found that the freedom the State gave the Party provided no defense. To the contrary, he said, Virginia's grant to the Party of "the right to choose the method of nomination makes the delegation of authority in this case more expansive, not less, for the Party is granted even greater power over the selection of its nominees." *Id.* 517 U.S. at 199–201, 116 S.Ct. at 1196.[11]

Justice Stevens summed up his view as follows:

> The imposition by an established political party—that is to say, a party authorized by state law to determine the method of selecting its candidates for elective office and also authorized to have those candidates' names automatically appear atop the general election ballot—of a new prerequisite to voting for the party's nominees is subject to § 5's preclearance requirement.

*Id.* 517 U.S. at 219–21, 116 S.Ct. at 1206. In the case at bar, the principal covered jurisdictions at issue also have authorized the state parties to determine the method of selecting their delegates. *See* ARIZ. REV. STAT. § 16–243; LA. REV. STAT. § 18:1280.27; VA.CODE § 24.2–508; *cf.* TEX. ELEC.CODE §§ 191.001, 191.007. And all of the covered jurisdictions have guaranteed the major party candidates—in this case their presidential nominees—automatic positions atop the general election ballot, provided that the parties obtain a minimum level of support in a recent election. *See* ARIZ. REV. STAT. §§ 16–502, –804; LA. REV. STAT. §§ 18:465, :1254, :1259; TEX. ELEC.CODE §§ 52.091, 192.031; VA.CODE §§ 24.2–101, –542, –543. Accordingly, it can hardly be frivolous to argue from *Morse* that these covered jurisdictions have delegated electoral power to the state parties through the former authorization, and to the National

---

10. *See also id.* 517 U.S. at 199–201 n. 18, 116 S.Ct. at 1196 n. 18 (Stevens, J.) (noting that in *Macguire v. Amos*, 343 F.Supp. 119 (M.D. Ala. 1972), "a three judge court held that rules promulgated by the Alabama Democratic and Republican Parties governing election of national delegates required preclearance, despite the fact that the rules were not passed by 'the State's legislature or by a political subdivision of the State'").

11. The DNC notes some tension between the passage quoted in the text and another passage distinguishing *Morse* from the Court's summary affirmance of a three-judge court's decision in *Williams v. Democratic Party*, Civ. No. 16286 (N.D. Ga. Apr. 6, 1972), *aff'd*, 409 U.S. 809, 93 S.Ct. 67, 34 L.Ed.2d 70 (1972). *Williams* held section 5 inapplicable to a Georgia Democratic Party rule, adopted to comply with a rule promulgated by the National Democratic Party, that governed the selection of delegates to the nation-al convention. Justice Stevens did describe *Williams* as a case where the state "exercised no control over, and played no part in, the state Party's selection of delegates," and therefore where the state had "delegated no authority to the Party to choose the delegates." 517 U.S. at 201–03, 116 S.Ct. at 1197; *see id.* 517 U.S. at 201–03 n. 19, 116 S.Ct. at 1197 n. 19. On the other hand, Justice Stevens went on to say that at the time of *Williams*, the Attorney General's regulations did not provide "administrative procedures for submission of" rule changes by political parties, *id.* 517 U.S. at 201–03, 116 S.Ct. at 1197, and that that ground "would have sufficed for our affirmance," *id.* 517 U.S. at 203–05, 116 S.Ct. at 1198 n. 21. He also questioned the precedential value of *Williams*, "not[ing] that a summary affirmance by this Court is a 'rather slender reed' on which to rest future decisions." *Id.* (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 784–85 n. 5, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)).

986

Democratic Party through the latter guarantee.

None of this is to suggest that there may not be good reasons to limit the reach of *Morse*'s "delegation" theory before it touches national party rules. One such reason is reflected in Justice Breyer's caution, acknowledged by Justice Stevens and stressed by the dissenters, that "First Amendment questions about the extent to which the Federal Government, through preclearance procedures, can regulate the workings of a political party convention, are difficult ones." *Morse*, 517 U.S. at 238–40, 116 S.Ct. at 1215 (Breyer, J.); *see id.* 517 U.S. at 227–31, 116 S.Ct. at 1210–11 (Stevens, J.); *id.* 517 U.S. at 240–46, 116 S.Ct. at 1216–18 (Scalia, J., dissenting); *id.* 517 U.S. at 248–53, 116 S.Ct. at 1220–21 (Kennedy, J., dissenting).

There is another strong argument for shortening the reach of the delegation theory. It is clear that what drove the majority opinions in *Morse* to extend the Voting Rights Act to state party activities was a concern generated by the historical background to the passage of the Act. The concern was that if the statute were applied only to direct actions by the covered states, those states might simply delegate their authority to their state parties—just as the Court found had happened in the White Primary Cases—and thus open "a loophole in the statute the size of a mountain." *Id.* 517 U.S. at 233–35, 116 S.Ct. at 1213 (Breyer, J.). But nothing in the historical context supports a concern that a covered jurisdiction would try to achieve this end by delegating authority to a *national* party, or that a national party would attempt to impose racially discriminatory rules on a covered jurisdiction. To the contrary, the fact that Congress restricted the application of the Voting Rights Act to specified geographic jurisdictions indicates that it did not have the same concerns regarding actions taken by other jurisdictions.

But the fact that defendants ultimately may be able to distinguish the national party rules at issue here from the state party rule at issue in *Morse* does not mean that a single district judge had the authority to dismiss LaRouche's challenge. No court has yet drawn the distinction considered here, so we can hardly say that "prior decisions inescapably render the claims frivolous...." *Goosby*, 409 U.S. at 518, 93 S.Ct. 854. And while *Morse* plainly does not foreclose the distinction the DNC needs to draw, it surely "leave[s] ... room for the inference that the questions sought to be raised [by LaRouche] can be the subject of controversy." *Goosby*, 409 U.S. at 518, 93 S.Ct. 854. Accordingly, because we cannot say that plaintiffs' section 5 claims are "essentially fictitious," "wholly insubstantial," or "obviously frivolous," we must remand them for consideration by a three-judge court.[12]

We make one exception to our remand. Included among the defendants in this case are the District of Columbia Democratic Party, the District of Columbia Democratic State Committee, and the chair of that committee. The District of Columbia is not a covered jurisdiction. *See* 28 C.F.R. pt. 51, app. Nor is there any allegation that the District of Columbia defendants acted with the authority of any covered jurisdiction or that their actions affected voting rights in any covered jurisdiction. Indeed, LaRouche does not even offer a theory for section 5 coverage of the District of Columbia defendants. *See* Reply Br. at 11 (discussing each of the other categories of defendants). Therefore, because the section 5 claims are "wholly insubstantial" with respect to these defendants, the district court had authority to dismiss them and we affirm that dismissal.[13]

---

**12.** We do not rule on a series of additional hurdles—not reached by the district court—that LaRouche must clear in order to establish his section 5 claim. For example, LaRouche must establish not only that the action of "a State or political subdivision," but also that they amounted to (1) a "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting," that (2) was "different from that in force or effect" on the dates specified in the statute. 42 U.S.C. § 1973c. LaRouche also must overcome the contention of several defendants that the district court lacks venue and personal jurisdiction over them.

**13.** The Arizona defendants contend that they, too, should be treated differently because the actions LaRouche complains of—the cancellation of the state's presidential preference primary election as to which he had qualified for a ballot position—was accomplished through an Arizona

## V

■ LaRouche also contends that Rule 11(K) and the Fowler letter deprived plaintiffs of their rights under 42 U.S.C. § 1983 and under the following provisions of the Constitution: Article II, Section 1; the First and Fifth Amendments; the Due Process and Equal Protection Clauses of the Fourteenth Amendment; and the Fifteenth Amendment. These claims, like the Voting Rights Act claim, are certainly not frivolous. Here, however, the district court's jurisdiction and our standard of review are considerably different. These statutory and constitutional claims do not require a three-judge court for decision. Although they were asserted in the same complaint as the Voting Rights Act claims, a single district judge may decide them and then refer the Voting Rights Act claims to a three-judge court. *See Hagans v. Lavine*, 415 U.S. 528, 543–44, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); 17 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4235 (2d ed.1988). And the district court's dismissal of these

claims under Fed.R.Civ.P. 12(b)(6) is subject to our de novo review. *See Taylor v. FDIC*, 132 F.3d 753, 761 (D.C.Cir.1997).

Although LaRouche bases his claims on both § 1983 and the Constitution, we have previously recognized that the case law relating to § 1983 claims, and that relating to claims brought directly under the Constitution, "have been assimilated in most ... respects." *Williams v. Hill*, 74 F.3d 1339, 1340 (D.C.Cir.1996) (internal quotation and citation omitted) (ellipsis in original); *see Hafer v. Melo*, 502 U.S. 21, 28, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 182 n. 4, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). LaRouche offers no argument for treating the two sets of claims differently and we therefore address them as one.[14]

Similarly, LaRouche presents his constitutional claims as an amalgam of the constitutional provisions cited above. He suggests no separate analysis for his First Amendment claims and asserts no difference between the appropriate analyses under the Due Process and Equal Protection Clauses.[15] As the Supreme Court's recent elec-

state court order. *See* Appellees' Br. at 27 (citing *Arizona State Democratic Comm. v. Secretary of State*, No. CV 96–00909 (Ariz.Super. Ct., Maricopa Co. Feb. 1, 1996)) (J.A. 342–50); *see also supra* note 2. But the fact that an electoral change was ordered by a state court rather than some other state body does not necessarily take it out of the coverage of section 5, and we therefore cannot conclude that the claim against the Arizona defendants is "obviously frivolous." *Cf. Hathorn v. Lovorn*, 457 U.S. 255, 265–66 n. 16, 102 S.Ct. 2421, 72 L.Ed.2d 824 (1982) ("[T]he presence of a court decree does not exempt the contested change from § 5.... [Section] 5 applies to any change reflecting the policy choices of the elected representatives of the people, even if a judicial decree constrains those choices.") (internal quotation omitted); *Cousins*, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (holding that state court decision interpreting state election law is "state action" for purposes of Fourteenth Amendment); *League of United Latin Am. Citizens*, 113 F.3d at 55 (claim that state court interpretation of previously precleared state law is subject to section 5 preclearance is not "wholly insubstantial" under *Goosby*).

14. LaRouche also asserted claims under 42 U.S.C. § 1985(3) which, he contends, provides a cause of action for conspiracies to violate constitutional rights even if the defendants are not state actors. Since we conclude *infra* that LaRouche's constitutional rights were not violated even if the defendants are considered state actors, § 1985(3) does not advance LaRouche's

cause. In any event, the discussion *infra* also demonstrates that plaintiffs can establish neither of the two requirements for a § 1985(3) cause of action: "(1) that some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action, and (2) that the conspiracy aimed at interfering with rights that are protected against private, as well as official, encroachment." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (alteration in original) (citations omitted); *see also United Bhd. of Carpenters of America, Local 610 v. Scott*, 463 U.S. 825, 840, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983).

15. *But see infra* note 37 (discussing plaintiffs' allusion to procedural due process claim). In the circumstances of this case, plaintiff's reference to the Fifteenth Amendment also adds nothing to the analysis. *Cf. Mobile v. Bolden*, 446 U.S. 55, 65–67, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (plurality opinion) (applying similar analysis under both Fifteenth Amendment and Fourteenth Amendment's Equal Protection Clause to claim that at-large system of municipal elections was unconstitutional); *Shaw v. Barr*, 808 F.Supp. 461, 469 n. 7 (E.D.N.C.1992) (same for racial gerrymandering and vote dilution claims), *rev'd on other grounds sub nom. Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

   Nor is anything added by LaRouche's passing reference to Article II, Section 1, of the Constitu-

tion law cases also treat such claims using a single basic mode of analysis,[16] we will do so here as well. Finally, LaRouche does not distinguish between his rights as a citizen and candidate and the rights of his adherents as citizens, supporters, and voters. The Supreme Court has found these various interests closely tied together and, except as indicated below, we find it unnecessary to disentangle them in order to resolve the merits of LaRouche's challenge.[17]

To succeed on his claims under § 1983 and the Constitution, LaRouche and his adherents must show (1) that the conduct they complain of is a form of "state action," [18] and (2) that such action deprived them of their constitutional rights. *See Washington v. District of Columbia,* 802 F.2d 1478, 1480 (D.C.Cir.1986) (citation omitted); *see also Tarkanian,* 488 U.S. at 191, 109 S.Ct. 454 (holding that only state action is subject to scrutiny under Due Process Clause of Fourteenth Amendment). We examine these issues in the following sections.

## A

The Supreme Court first considered whether political party activity constituted state action in the White Primary Cases described in Part IV above. We construed those cases broadly in *Georgia v. National Democratic Party,* where we found state action in the formulas the national parties used to allocate delegates to national nominating conventions. *See* 447 F.2d at 1275–76. We viewed the White Primary Cases as mandating that we regard the action of the individual state parties in selecting their convention delegates as state action, and concluded that the same was true when those parties acted through their delegates at the national convention. We also concluded that by placing the nominee of the convention on the ballot, the states "have adopted this narrowing process as a necessary adjunct of their election procedures." *Id.* at 1276. We followed *Georgia* in *Bode v. National Democratic Party,* holding that the Democratic National Committee's adoption of a formula for the

tion, which sets forth the qualifications for President of the United States. Although the DNC rule may have added a qualification for the position of Democratic candidate for President, it did not and was not intended to add a qualification for the Office of President itself any more than would any political party's basic requirement that its nominee be a member of the party. *Cf. Storer v. Brown,* 415 U.S. 724, 746 n. 16, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (state requirement that independent candidate in general election for U.S. Representative be unaffiliated with political party "no more establishes an additional requirement for the office of Representative than the requirement that [an affiliated] candidate win the primary to secure a place on the general ballot"); *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 835–36, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (state limitation on access to general election ballot violates congressional Qualifications Clauses where it has the likely effect and sole purpose of creating additional qualification for service in Congress).

16. *See Anderson v. Celebrezze,* 460 U.S. 780, 787 n. 7, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) ("[W]e base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis. We rely, however, on the analysis in a number of our prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment."); *see also Norman,* 502 U.S. at 288 n. 8, 112 S.Ct. 698; *Republican Party v. Faulkner County,* 49 F.3d 1289, 1293 n. 2 (8th Cir.1995) ("In election cases, equal protection challenges

essentially constitute a branch of the associational rights tree.").

17. *See Anderson,* 460 U.S. at 786, 103 S.Ct. 1564 (" '[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.' ") (citation omitted); *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (same); *Rhodes,* 393 U.S. at 30, 89 S.Ct. 5 ("In the present situation, the state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters . . . to cast their votes effectively.")

18. For the kind of conduct at issue here, the "under color of state law" standard of § 1983 and the "state action" requirement for a claim under the Constitution are synonymous. *See Hafer,* 502 U.S. at 28, 112 S.Ct. 358 ("[I]n § 1983 actions the statutory requirement of action 'under color of' state law is just as broad as the Fourteenth Amendment's 'state action' requirement."); *Tarkanian,* 488 U.S. at 182 n. 4, 109 S.Ct. 454; *see also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935 & n. 18, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (holding conduct that satisfies "state action" requirement of Fourteenth Amendment also satisfies "under color of state law" requirement, but noting that conduct satisfying latter may sometimes not satisfy former).

allocation of delegates to its 1972 national convention was "tantamount to a decision of the States acting in concert and therefore subject to constitutional standards applicable to state action." 452 F.2d at 1304–05.[19]

We initially took the same approach again in *Brown v. O'Brien,* holding that delegate-seating decisions by the Credentials Committee of the 1972 Democratic National Convention constituted state action. We rejected one constitutional attack on such a decision on its merits, but sustained another attack on the ground that the Committee's action was so unfair as to violate the Due Process Clause. *See* 469 F.2d 563, 565, 569–70 (D.C.Cir.1972).[20] As noted above, however, the Supreme Court stayed that decision, leaving it to the Convention itself to decide whether to give the litigants the relief they had sought in federal court. Although the Court did not decide the issue, it found that "[h]ighly important questions are presented concerning ... whether the action of the Credentials Committee is state action" and expressed "grave doubts as to the action taken by the Court of Appeals." *O'Brien v. Brown,* 409 U.S. at 4–5, 92 S.Ct. 2718. In the same opinion, the Court also seemed to limit the reach of the White Primary Cases, noting that "[t]his is not a case in which claims are made that injury arises from invidious discrimination based on race in a primary contest within a single State." *Id.* at 4 n. 1, 92 S.Ct. 2718 (citing *Terry,* 345 U.S. 461, 73 S.Ct. 809, and *Smith,* 321 U.S. 649, 64 S.Ct. 757).

Three years later, in a case arising out of the same delegate-selection battle, *see supra* note 4, the Supreme Court again sidestepped the question of whether party action was state action. In *Cousins v. Wigoda,* the Court held that an Illinois court had uncon-stitutionally attempted to enjoin delegates selected pursuant to Democratic Party rules from taking their seats at the 1972 national convention. Because the case arose in the context of a state court injunction, however, the existence of state action was clear and it was "not necessary" to determine "whether the decisions of a national political party in the area of delegate selection constitute state or governmental action." 419 U.S. at 483 n. 4, 95 S.Ct. 541 (internal quotation omitted).

When we again considered the question of whether national party action was state action, we found the answer to be "much less clear" than we had in *Georgia* and *Bode.* *See Ripon Soc'y, Inc. v. National Republican Party,* 525 F.2d 567, 574 (D.C.Cir.1975) (en banc). *Ripon* involved an equal protection challenge to the delegate-allocation formula adopted by the Republican Party for its 1976 national convention. We noted that *O'Brien* had specifically questioned our finding that decisions by a party credentials committee constituted state action, and also appeared to narrow the White Primary Cases. *See id.* at 575. This gave us "reason to question the premise of our first line of reasoning in *Georgia,* i.e., that the elective processes of individual state parties constituted state action for all purposes." *Id.* at 575 n. 20. We also noted that "[e]ven assuming our finding of state action in *Georgia* rested ... on the ... placement of the candidate's name on the [state] ballot," the Supreme Court's subsequent decisions in "*Moose Lodge* and *Jackson* must still give us pause. Both cases rejected claims of state action based on the award to the defendants of a state benefit...." *Id.* at 575 n. 18.[21] And we pointed out that the "nexus between the states and the delegate-allocation formula is open to

**19.** Although we found state action, we rejected plaintiffs' challenges in both *Georgia* and *Bode* on the merits. *See Georgia,* 447 F.2d at 1280; *Bode,* 452 F.2d at 1310.

**20.** *Brown* rejected an attack by Illinois' uncommitted Wigoda delegates on their unseating and enjoined them from further prosecuting an Illinois state court action they had brought against those who challenged their seats before the Credentials Committee. *See* 469 F.2d at 570–75; *supra* note 4. *Brown* upheld an attack by California's McGovern delegates on their unseating and remanded for entry of an order enjoining the

Democratic Party from unseating them. *See* 469 F.2d at 566–70.

**21.** In *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 171–77, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the Court held that the state's issuance of a liquor license to a private lodge was insufficient to render the lodge's refusal to serve an African-American "state action." In *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 358, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the Court found that the state's grant of regulated monopoly status to a privately-owned public utility was insufficient to make the utility a state actor.

question particularly since the Supreme Court has also now held in *Cousins v. Wigoda*, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975), that an individual state is without power to interfere with the delegate selection procedures of a national convention." 525 F.2d at 574. In light of these uncertainties, and because it was "clear to us that plaintiffs' case must fail on its merits without regard to whether or not there is state action," we "decline[d] to decide" the state action question. *Id.* at 576.

Unfortunately, the question of whether the delegate- or candidate-selection rules of political parties constitute state action has not become any clearer since *Ripon.* Subsequent Supreme Court decisions dealing with party rules all have involved conflicts between those rules and state laws, rather than intra-party disputes like this one. *See, e.g., Eu*, 489 U.S. at 216–19, 109 S.Ct. 1013; *Tashjian*, 479 U.S. at 210–13, 107 S.Ct. 544; *LaFollette*, 450 U.S. at 109–20, 101 S.Ct. 1010. In *Flagg Bros. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), however, although the Court was not faced with a challenge to party electoral rules,[22] it did in dictum again suggest a narrow view of the White Primary Cases. Then–Justice Rehnquist attributed the Court's finding of state action in the White Primary Cases to a conclusion that the elections in those cases constituted "public functions." *Id.* at 158, 98 S.Ct. 1729. A public function, he said, is not simply one "traditionally performed by governments," but rather one "traditionally exclusively reserved to the State." *Id.* at 157–58, 98 S.Ct. 1729 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).[23] More-

over, he continued, "[t]he doctrine does not reach to all forms of private political activity, but encompasses only state-regulated elections or elections conducted by organizations which in practice produce 'the uncontested choice of public officials.'" *Id.* at 158, 98 S.Ct. 1729 (quoting *Terry*, 345 U.S. at 484, 73 S.Ct. 809).

If a party must produce the nation's "uncontested choice" for President of the United States to qualify as a state actor, the Democratic (or Republican) Party plainly does not qualify. Nor did the actions of the DNC at issue here involve a "state-regulated election" in the *Flagg Bros.* sense. Although arguably the state parties could have read the Fowler letter as instructing them to keep LaRouche off state primary ballots, there is no allegation that they attempted to do that, and an affidavit filed by the DNC indicates that it did not intend the letter to be read in that way. *See* J.A. 273 (Aff. of Richard Q. Boylan, Director of Party Affairs and Delegate Selection for the DNC). In fact, LaRouche participated in all of the state-run primary elections at issue, and his adherents expressed their support by voting for him. The rub did not come until he wanted to use the results of those state-run primaries to require the Party to accept his convention delegates. At that point, the DNC simply ignored the results of the primaries and selected delegates according to internal party rules.[24]

Nor does a national political convention readily fit the *Flagg Bros.* description of a "public function" as one "traditionally exclusively reserved to the State." Indeed, histo-

---

**22.** The challenge in *Flagg Bros.* was to a warehouseman's proposed sale of goods entrusted to him for storage, as permitted by New York law. *See* 436 U.S. at 151–52, 98 S.Ct. 1729.

**23.** The quotation from *Jackson* has been repeated in several subsequent state action cases. *See, e.g., San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 544, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987); *Blum v. Yaretsky*, 457 U.S. 991, 1011, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *see also Tarkanian*, 488 U.S. at 197 n. 18, 109 S.Ct. 454.

**24.** This distinguishes the case from the Eleventh Circuit's finding of state action in a decision by Georgia's "presidential candidate selection com-

mittee" to delete David Duke's name from the list of potential Republican presidential candidates on the Georgia presidential preference primary ballot. *See Duke v. Cleland*, 5 F.3d 1399, 1404 (11th Cir.1993). The Georgia Code established the committee, named its members (including the Secretary of State of Georgia and specified state legislative officers), and gave it the power to delete a name from the list if all committee members of the same party as the candidate agreed. *See id.* at 1401–02 & n. 1. The Eleventh Circuit's decision involving a similar committee's deletion of Duke's name from the list of candidates for the Florida presidential primary is distinguishable on the same ground. *See Duke v. Smith*, 13 F.3d 388 (11th Cir.1994).

ry is largely to the contrary. *See* V.O. KEY, JR., POLITICS, PARTIES AND PRESSURE GROUPS 475 (1953) (noting that the institution of the convention "[e]volv[ed] completely outside the Constitution and laws. . . . [It is] an extraconstitutional, semiprivate gathering"). *But see id.* at 400 ("The national conventions, creatures of party custom, remain beyond state jurisdiction, yet state law often prescribes the methods for the choice of delegates to the convention.") (referring to practice prior to the decisions in *Cousins* and *LaFollette*, discussed *infra*).[25]

This brings us back finally to the splintered majority opinions in *Morse*, which appear to revive a considerably more expansive view of state action and the White Primary Cases than that expressed in *Flagg Bros.* As noted above, the opinions of both Justice Stevens and Justice Breyer rested their conclusions that the party was the "state" for purposes of the Voting Rights Act on their reading of the history of the White Primary Cases. Justice Stevens relied particularly on the fact that Virginia reserved the two top positions for the major parties to fill with their nominees, thus delegating to the parties "the power to determine part of the field of candidates from which the voters must choose." *Morse*, 517 U.S. at 197–98, 116 S.Ct. at 1195. He essentially rejected *Flagg Bros.'* dictum that, to be classified as a state actor, the party must produce an uncontested choice for the position. "Voting at the nomination stage is protected," Justice Stevens

said, "regardless whether it 'invariably, sometimes, or never determines the choice of the representative.' " *Id.* 517 U.S. at 217–19, 116 S.Ct. at 1205 (quoting *United States v. Classic*, 313 U.S. 299, 318, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). And "state delegation of selection powers to two adversaries instead of just one state actor does not preclude a finding of state action." *Id.* 517 U.S. at 223–25 n. 36, 116 S.Ct. at 1208 n. 36.[26] The States' authorization to the parties to make their own decisions regarding delegate selection was sufficient, and the absence of "extensive" state regulation of the process was "irrelevan[t]." *Id.* 517 U.S. at 199–201 n. 17, 116 S.Ct. at 1196 n. 17.

The Justices' opinions in *Morse* on the constitutional import of the White Primary Cases do not, of course, represent holdings on that issue, since the question in *Morse* was whether the Virginia Republican Party's actions were those of a "state or political subdivision" under the Voting Rights Act, and not whether they where those of a "state" under the Constitution and § 1983. Nonetheless, Justice Stevens' opinion made clear that he equated the two, and that he based his conclusion about the Voting Rights Act on his reading of the constitutional test of the White Primary Cases. *See, e.g., id.* 517 U.S. at 219–21, 116 S.Ct. at 1206 ("The Voting Rights Act uses the same word as the Fifteenth Amendment—'state'—to define the authorities bound to honor the right to vote. . . . Imposing different constructions on

**25.** The institution of the national nominating convention, which emerged in 1831, could be regarded as taking a step away from state action (at least under certain criteria), as it supplanted nomination by caucuses of each party's members of Congress as well as nomination by state legislatures. *See* KEY, *supra*, at 400–03; CONGRESSIONAL QUARTERLY, GUIDE TO U.S. ELECTIONS 5 (1975). Although conventions were intended as a step toward the selection of nominees by the entire party membership, they often came under the control of party bosses. *See id.* at 404–07. President Harding, for example, reputedly won his party's nomination in the infamous (although possibly apocryphal) "smoke-filled room" at Chicago's Blackstone Hotel in 1920. *See* EDWARD MCCHESNEY SAIT, AMERICAN PARTIES AND ELECTIONS 590 n.93 (3d ed.1942). Although state-run primaries were introduced in the beginning of the 20th Century, it was not until 1972 that the parties chose the majority of their delegates through primaries. *See* Leonard P. Stark, *The Presiden-*

*tial Primary and Caucus Schedule: A Role for Federal Regulation*, 15 YALE L. & POL'Y REV. 331, 333 (1996). Credentials challenges have occurred at almost every convention, and the conventions historically have been the judges of the qualifications of their members. *See* KEY, *supra*, at 458–59; CONGRESSIONAL QUARTERLY, *supra*, at 11; *see also O'Brien*, 409 U.S. at 5, 92 S.Ct. 2718 ("[F]or nearly a century and a half the national political parties themselves have determined controversies regarding the seating of delegates to their conventions.").

**26.** That view was in sharp contrast to the view of three of the dissenters, who would have limited the White Primary Cases to "state-regulated elections or elections conducted by organizations which in practice produce the uncontested choice of public officials." *Id.* 517 U.S. at 266–68, 116 S.Ct. at 1229 (Thomas, J., dissenting) (quoting *Flagg Bros.*, 436 U.S. at 158, 98 S.Ct. 1729).

the same word is especially perverse in light of the fact that the Act ... was passed to enforce that very Amendment."). Whether Justice Breyer intended to equate the two is much less certain. *See id.* 517 U.S. at 238–40, 116 S.Ct. at 1215 (Breyer, J.) ("We need not go further in determining when party activities are, in effect, substitutes for state nominating primaries because the case before us involves a nominating convention that resembles a primary about as closely as one could imagine."). Justice Thomas, writing for himself, the Chief Justice, and Justice Scalia, however, had no doubt. He described both the Stevens and Breyer opinions as "suggest[ing] that the meaning of the statutory term 'State' in § 5 is necessarily coterminous with the constitutional doctrine of state action." *Id.* 517 U.S. at 264–66, 116 S.Ct. at 1228 (Thomas, J.); *see also id.* 517 U.S. at 276–78, 116 S.Ct. at 1234 ("The basis for today's decision ... can only be the state action doctrine.").

If the result in *Morse* signals the Court's future view of state action in the electoral context, then there would be grounds for concluding that the Democratic Party's conduct here constituted state action. As noted in Part IV, the states have delegated substantial control over the delegate-selection process to the state party. The states also have given the candidates that emerge from the national party conventions various forms of preference in access to the states' general election ballots. *Cf. Mrazek v. Suffolk County Bd. of Elections,* 630 F.2d 890, 894 n. 8 (2d Cir.1980) (suggesting that nominating procedures must conform to constitutional requirements because "ensured access to the ballot [may] constitute[ ] a form of state action").

But even if a political party could be considered a state actor, it is at the same time clothed with strong First Amendment protec-

tions against intrusion by the state.[27] This is not simply a matter of dividing the universe of potential party activities into their public (state) and private (First Amendment-protected) spheres. The Court's cases have made clear that the very actions at issue here—the Party's decisions about who can be nominated as delegates and even about who can be considered a Democrat—are themselves clothed in First Amendment protection. Indeed, those cases suggest that if the State of Louisiana had tried to assist LaRouche by attempting to enforce the results of its primary (which yielded him one delegate) against the DNC, it would have been met with the bar of the First Amendment.

For example, the plaintiffs in *Cousins v. Wigoda,* the Wigoda delegates, had been elected in the state-run Illinois primary as Chicago's delegates to the 1972 Democratic National Convention. The Cousins delegates, who had been picked at private party caucuses, successfully challenged the seating of the Wigoda delegates before the Credentials Committee on the ground that the latter had been selected in violation of party rules requiring, inter alia, participation by minorities, women and youth. The Wigoda delegates counterattacked by obtaining an injunction from an Illinois court barring the Cousins delegates from taking their seats. *See* 419 U.S. at 478–81 & n. 1, 95 S.Ct. 541. The Supreme Court vacated the injunction, holding that "[t]he National Democratic Party and its adherents enjoy a constitutionally protected right of political association," *id.* at 488, 95 S.Ct. 541, that the "subordinating interest of the State must be compelling ... to justify the injunction's abridgement of the exercise" of those rights, *id.* at 489, 95 S.Ct. 541 (internal quotation omitted), and that Illinois' interest in ensuring that its primary results were honored "cannot be deemed compelling in the context of the selection of

---

**27.** *See Eu,* 489 U.S. at 224, 109 S.Ct. 1013 ("It is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments."); *Tashjian,* 479 U.S. at 214, 107 S.Ct. 544 ("The freedom of association protected by the First and Fourteenth Amendments includes partisan political organizations."); *LaFollette,* 450 U.S. at 121, 101 S.Ct. 1010 (" 'The National Democratic Party and its adherents enjoy a constitutionally protected right of political association.' ") (quoting *Cousins,* 419 U.S. at 487, 95 S.Ct. 541); *see also Faulkner*

*County,* 49 F.3d at 1295 ("The Supreme Court has located political parties roughly midway between conventional public and private institutions, attributing to parties elements of both."); *cf. Polk County v. Dodson,* 454 U.S. 312, 321, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (holding that "it is the constitutional obligation of the State to respect the professional independence" of public defenders, even though some actions of public defenders may be under color of state law).

delegates to the National Party Convention," *id.* at 491, 95 S.Ct. 541.

The Court followed *Cousins* in *LaFollette.* There, the Court ruled that the Wisconsin Supreme Court could not insist that delegates chosen through the state's non-partisan, open primary be seated at the 1980 Democratic National Convention, when DNC rules provided that only voters publicly affiliated with the Party could participate in the delegate-selection process. "The issue," the Court said, "is whether the State may compel the National Party to seat a delegation chosen in a way that violates the rules of the Party. And this issue was resolved, we believe, in *Cousins v. Wigoda.*" 450 U.S. at 121, 101 S.Ct. 1010. Finding that the State did not have "compelling interests ... [to] justify its substantial intrusion into the associational freedom of members of the National Party," the court reversed the Wisconsin court's decision. *Id.* at 124–26, 101 S.Ct. 1010.

The fact that the actions of the Democratic Party at issue here themselves have a First Amendment dimension strongly suggests that we should not apply the usual test for the validity of electoral restraints imposed by state governments—even if we were to conclude that the Party is a state actor. As the Court said in *O'Brien,* even if party delegate-selection rules are state action, we still must consider "the reach of the Due Process Clause in this unique context." 409 U.S. at 4, 92 S.Ct. 2718; *cf. Ripon,* 525 F.2d at 578–79 (noting that a given constitutional command may impose different requirements on different parts of the state). We consider the appropriate test to apply to the DNC rules in the next section, and apply that test in the one thereafter. We conclude that even were we to view Rule 11(K) and the Fowler letter as state action, defendants did not violate constitutional rights guaranteed to LaRouche and his supporters. For that reason, as we did in *Ripon,* we assume without deciding that defendants are state actors and proceed to the next stage of the analysis.

**B**

■ In this section we consider how strictly to scrutinize the conduct attacked by LaRouche. LaRouche contends that the appropriate standard is strict scrutiny, requiring the party to demonstrate that its rules are "narrowly tailored to serve a compelling interest." Although in the past the Supreme Court did apply strict scrutiny to state restrictions on candidates and parties seeking access to the ballot, *see, e.g., Rhodes,* 393 U.S. at 31, 89 S.Ct. 5; *see also* GERALD GUNTHER & KATHLEEN M. SULLIVAN, CONSTITUTIONAL LAW 890 (13th ed.1997), more recent cases have employed the two-pronged approach described in *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). Under this approach, "when [First and Fourteenth Amendment] rights are subjected to 'severe' restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Id.* at 434, 112 S.Ct. 2059 (internal quotation omitted). However, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' ..., the State's important regulatory interests are generally sufficient...." *Id.* (internal quotation omitted); *see also Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 117 S.Ct. 1364, 1370, 137 L.Ed.2d 589 (1997).

Accordingly, even if we were to apply the *Burdick* test to the DNC's rules, it would not necessarily result in strict scrutiny. LaRouche and his supporters plainly do have First Amendment interests at stake.[28] But if the restrictions imposed on plaintiffs are viewed from the standpoint of the "state's" electoral process as a whole—that is, as a combination of ballot access provided through both political party nomination and independent candidacy—it is not necessarily clear that the restrictions on plaintiffs were "severe." LaRouche's adherents still retained the right to express their political views by supporting other Democratic nominees, even if they could not nominate LaRouche.[29] And LaRouche retained the right

---

**28.** *See Tashjian,* 479 U.S. at 214, 107 S.Ct. 544 ("The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom."); *Anderson,* 460 U.S. at 787–88, 103 S.Ct. 1564 ("The exclusion of candidates ... burdens voters' freedom of association,

because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying-point for like-minded citizens.").

**29.** *Cf. Anderson,* 460 U.S. at 791 n. 12, 103 S.Ct. 1564 (finding burden imposed by state disaffilia-

to run, and his supporters the right to vote for him, as either a third-party or independent candidate.[30] Nor is there any reason to believe that LaRouche's ultimate chances of becoming President would have been measurably lessened by taking those routes than by seeking nomination at the Democratic National Convention—where by his own count he would have had only two of 4320 delegates. *See* Appellants' Br. at 8 n.8; Appellees' Br. at 3. Accordingly, even if the specific burden imposed on LaRouche by the DNC Rules were "severe," the overall burden imposed by the "state" may not have been severe enough to require strict scrutiny under *Burdick*.

More importantly, we are not persuaded that the *Burdick* test is appropriate for application to this case. That test, after all, was designed for a challenge to a state law *by* a citizen or political party asserting First Amendment rights, and hence weighs the state's interests against the rights protected by the Amendment. It was not designed for a case in which the First Amendment weighs on both sides of the balance. The application of judicial strict scrutiny to the internal rules of a political party (setting aside, because they are not at issue here, party rules that effectively control state-run primary ballots) simply raises too many troubling questions. [31]

May a court require a political party— itself a First Amendment creature—to show a compelling justification before it may limit a putative candidate's ability to associate himself with the party? May a court require a political party to show that such a limita-tion is narrowly tailored to meet that compelling justification? The difficulty of the issue is made manifest by holding it up to a mirror: if a state, finding Rule 11(K) unfair, were to adopt LaRouche's position by statute (by, for example, outlawing "litmus tests" for party nominees), could the Party be required to show a compelling interest for its rule to invalidate the statute? We already know the Supreme Court's likely answer to this question, as *Cousins* and *LaFollette* presented similar situations. The answer is that the DNC would not have the burden of justifying its rule. To the contrary, it is the state that would have to show that its interest was "compelling ... to justify the ... abridgment of the exercise by ... the National Democratic Party of [its] constitutionally protected rights." *Cousins*, 419 U.S. at 489, 95 S.Ct. 541; *see LaFollette*, 450 U.S. at 124, 101 S.Ct. 1010; *see also Eu*, 489 U.S. at 225, 109 S.Ct. 1013 (holding that California law barring political party from endorsing candidates in primary "can only survive constitutional scrutiny if it serves a compelling governmental interest").

But if a state cannot, at the behest of a plaintiff like LaRouche, require a political party to change its rules unless it can show a compelling reason for retaining them, then should it make a difference if a federal court is asked to impose the same requirement? The federal courts, after all, act with the authority of the "state" (i.e., the federal government), and their intrusion into the First Amendment rights of a political party can be

---

tion requirement in *Storer v. Brown* less severe than early filing deadline for independent candidates in *Anderson* because, "[a]lthough a disaffiliation provision may preclude [independent] voters from supporting a particular ineligible candidate, they remain free to support and promote other candidates"); *Timmons*, 117 S.Ct. at 1371, 1372 ("[Although] Minnesota's fusion ban prevents the New Party from using the ballot to communicate to the public that it supports a particular candidate who is already another party's candidate," "the New Party remains free to endorse whom it likes, to ally itself with others, to nominate [other] candidates for office, and to spread its message to all who will listen.").

**30.** *See Storer*, 415 U.S. at 728, 94 S.Ct. 1274 ("[T]he State must ... provide feasible means for other political parties and other candidates to appear on the general election ballot."); *cf. Ri-*

*pon*, 525 F.2d at 586 ("Theoretically at least, persons dissatisfied with the choice facing them in [the general] election may gain access to the ballot by means other than a major party nomination."); *Duke v. Massey*, 87 F.3d 1226, 1233 (11th Cir.1996) ("Duke supporters do not have a First Amendment right to associate with him as a Republican Party presidential candidate. Duke's supporters were not foreclosed from supporting him as an independent candidate, or as a third party candidate in the general election.") (citation omitted).

**31.** As in *Ripon*, we also intimate no view about what standard should apply in a situation, like the White Primary Cases, "where there is only one party with a realistic chance to win the election, and where a vote in the nominating process is the only effective vote that can be cast." 525 F.2d at 589.

as invasive as that of any state. *Cf. Tashjian*, 479 U.S. at 224, 107 S.Ct. 544 (" '[A] State, *or a court*, may not constitutionally substitute its own judgment for that of the Party.' ") (quoting *LaFollette*, 450 U.S. at 123–24, 101 S.Ct. 1010) (emphasis added); [32] *O'Brien*, 409 U.S. at 5, 92 S.Ct. 2718 (recognizing that "[v]ital rights of association guaranteed by the Constitution" are involved in federal court challenges to party delegate-seating decisions). As we have noted above, in *Cousins* the Wigoda delegates asserted the authority of state law to bar the Democratic Party from seating delegates elected according to Party rules. The Court responded that state law could not support such an intrusion unless the State's interests were compelling. *See* 419 U.S. at 489, 95 S.Ct. 541. If the Wigoda delegates instead had asserted the authority of the U.S. Constitution to support the same end, would the burden of showing a compelling interest have been completely reversed? We doubt such a change in argument would have so dramatically altered the parties' burdens.

There is yet another reason for rejecting the applicability of strict scrutiny to intraparty rules. One of the principal triggers for such scrutiny in the usual First Amendment context is viewpoint discrimination. *See, e.g., Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828–30, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Yet that trigger is of doubtful applicability in the political party context. In this case, for example, one of LaRouche's complaints is that "[t]he very nature of the 'test' which is embodied in Rule 11(K)"—a test limiting candidates to "bona fide Democrats"—is by definition "an invasion of the free speech of candidates." Appellants' Br. at 28. Indeed, were the State of Louisiana to adopt a similar rule for the general election—for example, by limiting the ballot to bona fide Democrats, or to Democrats and Republicans while excluding independents—there can be little doubt that the State's law would fall. *See Rhodes*, 393 U.S. at 32, 89 S.Ct. 5 (invalidating ballot access law that "favors two particular parties—the Republicans and the Democrats—and in effect tends to give them a complete monopoly"); *supra* note 30, 89 S.Ct. 5; *cf.*

*Burdick*, 504 U.S. at 434, 112 S.Ct. 2059 (applying lesser scrutiny only where state imposes "nondiscriminatory restrictions").

But it is also obvious that viewpoint discrimination by a political party is quite another matter. Indeed, it is the *sine qua non* of a political party that it represent a particular political viewpoint. And it is the purpose of a party convention to decide on that viewpoint, in part by deciding which candidate will bear its standard: the liberal or the conservative, the free trader or the protectionist, the internationalist or the isolationist. Unlike a state, which is largely barred from making such decisions, a political party must make these decisions. Since in the end there will be only one Democratic and one Republican Party candidate on the general election ballot, their conventions ultimately *must* choose a political viewpoint. Surely even plaintiffs would agree that if the Democratic Party had chosen LaRouche over President Clinton as its candidate in 1996, the choice would have constituted the expression of a particular political point of view.

In sum, we conclude that even if a political party is a state actor, the presence of First Amendment interests on both sides of the equation makes inapplicable the test applied to electoral restrictions where the First Amendment weighs on only one side. As the Supreme Court has not yet had to devise a test for such a case, we return to the one this court applied the last time it faced a similar situation. In *Ripon*, we found that plaintiffs' equal protection interest in the delegate-selection rules of a political party was "offset by the First Amendment rights exercised by the Party in choosing the [delegate allocation] formula it did." 525 F.2d at 588. Accordingly, we concluded that even if the Party were a state actor, the Constitution was "satisfied if [the party's rules] rationally advance some legitimate interest of the party in winning elections or otherwise achieving its political goals." *Id.* at 586–87. Notwithstanding the passage of time since it was first announced, this test remains the one that best effectuates the Supreme Court's direction to approach judicial intervention in

---

**32.** Although *LaFollette* made this statement in the course of reversing a state court judgment,

*Tashjian* quoted it in the context of a federal action.

this area "with great caution and restraint," and to recognize "the large public interest in allowing the political processes to function free from judicial supervision." *O'Brien,* 409 U.S. at 4–5, 92 S.Ct. 2718.[33]

## C

■ We begin the *Ripon* analysis by noting that the Party interest at issue is a "legitimate" one. "There are no racial or other invidious classifications here" as there were in the White Primary Cases. *Ripon,* 525 F.2d at 588; *see also Eu,* 489 U.S. at 232, 109 S.Ct. 1013 ("This .... is not a case where intervention is necessary to prevent the derogation of the civil rights of party adherents."). There is, of course, viewpoint discrimination at play. But as we have already noted, there is nothing illegitimate about that kind of discrimination in a political party's nomination process.

Moreover, the Party's interest is not merely legitimate. Here, the associational rights of the Democratic National Party are at their zenith. The Party's ability to define who is a "bona fide Democrat" is nothing less than the Party's ability to define itself. In *Eu,* for example, one of the challenged state laws "prevent[ed] party governing bodies from stating whether a candidate adheres to the tenets of the party or whether party officials believe that the candidate is qualified for the position sought." 489 U.S. at 223, 109 S.Ct. 1013. The Court struck the law down. "Freedom of association," Justice Marshall said, "means ... that a political party has a right to 'identify the people who constitute the association' ... and to select a 'standard bearer who best represents the party's ideologies and preferences.'" *Id.* at 224, 109 S.Ct. 1013 (quoting *Tashjian,* 479 U.S. at 214, 107 S.Ct. 544, and *Ripon,* 525 F.2d at 601 (Tamm, J., concurring)); *see also LaFollette,* 450 U.S. at 122 n. 22, 101 S.Ct. 1010 ("'Freedom of association would prove an

empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being.'") (quoting L. TRIBE, AMERICAN CONSTITUTIONAL LAW 791 (1978)).[34]

The Party's effort to limit the list of candidates who can represent themselves to the voters as Democrats "rationally advance[s the] legitimate interest of the party in winning elections." *Ripon,* 525 F.2d at 586–87. By narrowing the field of those who represent it, the Party seeks to define its values, distinguish them from those of its competitors, and thereby attract like-minded voters. At the same time, it seeks to prevent confusion among those voters by excluding from its list of potential presidential nominees those who do not share those values. *Cf. Munro v. Socialist Workers Party,* 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986) (holding state interest in avoiding voter confusion, ballot overcrowding, or the presence of frivolous candidates sufficient to justify reasonable restrictions on ballot access by minor parties). It advances the Party's ability to "achiev[e] its political goals" in other ways as well. *Id.* at 587. As the Court said in *LaFollette,* when barring Wisconsin from requiring the Democratic Party to accept delegates selected through the state's open primary:

Here, the members of the National Party, speaking through their rules, chose to define their associational rights by limiting those who could participate in the process leading to the selection of delegates to their National Convention. On several occasions this Court has recognized that the inclusion of persons unaffiliated with a political party may seriously distort its collective decisions—thus impairing the party's essential functions—and that political parties may accordingly protect themselves

---

**33.** While *Ripon,* unlike this case, involved a "one person, one vote" challenge, this distinction does not change our analysis. Notably, the *Ripon* court thought its case was analogous to others involving different constitutional challenges, including those under the First Amendment. *See* 525 F.2d at 586 n. 61.

**34.** The Eleventh Circuit reached a similar conclusion in *Duke v. Massey,* holding that "[t]he

Republican Party has a First Amendment right to freedom of association and an attendant right to identify those who constitute the party based on political beliefs.... Therefore the ... Republican Party did not have to accept [David] Duke as a Republican presidential candidate. Duke does not have the right to associate with an 'unwilling partner.'" 87 F.3d at 1234.

from intrusion by those with adverse political principles.

450 U.S. at 122, 101 S.Ct. 1010 (internal quotation omitted).

LaRouche, of course, would dispute the applicability of this passage, arguing that unlike the open primary voters in Wisconsin, he is not "unaffiliated" with the Democratic Party and does not have "adverse political principles." But the Party itself obviously disagrees—and vociferously so. *See* J.A. 73–74 (Fowler letter) ("Mr. Larouche's [sic] expressed political beliefs ... [are] utterly contrary to the fundamental beliefs, values and tenets of the Democratic Party. . . ."). Nor is the Party required to accept LaRouche's self-designation as the final word on the matter. Rather, the Party's "freedom to join together in furtherance of common political beliefs 'necessarily presupposes the freedom to identify the people who constitute the association.'" *Tashjian*, 479 U.S. at 214, 107 S.Ct. 544 (quoting *LaFollette*, 450 U.S. at 122, 101 S.Ct. 1010); *see id.* at 224, 107 S.Ct. 544 ("The Party's determination of the boundaries of its own association ... is protected by the Constitution.").

LaRouche makes clear that his fundamental complaint is not so much with the Party's right to define itself, but rather with the "unfair" manner in which he contends it has done so. Even this claim is less than fully developed. Although he complains of the vagueness of the "bona fide Democrat" standard, he proposes no alternative substantive definition, and we can think of none that a court could impose within the strictures of the First Amendment. Indeed, LaRouche does not even propose an alternative set of procedures for selecting delegates, nor does he insist that the only fair procedure would be to seat any delegate whose candidate won sufficient votes in a primary. Instead, he asks only that the Party be enjoined "from promulgating similar provisions as found in Rule 11(K), in the future." Compl. ¶ 150 (J.A. 49).

The answer to this aspect of LaRouche's complaint is that the Party's First Amendment rights extend not only to defining itself, but also to determining how to define itself. The Supreme Court made this point in both *Cousins* and *LaFollette* by upholding the Party's right to determine who could select its delegates, notwithstanding the states' views that a different process would be more appropriate. *See, e.g., LaFollette*, 450 U.S. at 124, 101 S.Ct. 1010 ("A political party's choice among the various ways of determining the makeup of a State's delegation to the party's national convention is protected by the Constitution."). The Court faced a similar question again in *Eu*, where the California Elections Code dictated, among other things, the organization and composition of the state parties' official governing bodies. To ensure fairness to the state's various regions, the Code required that the position of party chair rotate between residents of northern and southern California. *See* 489 U.S. at 216, 109 S.Ct. 1013. Citing its decisions in *Cousins* and *LaFollette*, the Court struck the law down, saying: "[A] political party's determination ... of the structure which best allows it to pursue its political goals is protected by the Constitution. Freedom of association also encompasses a political party's decisions about the identity of, and the process for electing, its leaders." *Eu*, 489 U.S. at 229, 109 S.Ct. 1013 (internal quotations and citations omitted). "[A] State cannot," the Court said, "substitute its judgment for that of the party as to the desirability of a particular internal party structure." *Id.* at 233, 109 S.Ct. 1013.

This court reached the same conclusion in *Ripon*, where we rejected the contention that the Equal Protection Clause required the Republican Party to allocate its national convention delegates on a one-person, one-vote basis. In letting stand the Party's practice of awarding "victory bonuses" to states voting Republican in prior elections, we observed:

A party is .... more than a forum for all its adherents' views. It is an organized attempt to see the most important of those views put into practice through control of the levers of government. One party may think the best way to do so is through a 'strictly democratic' majoritarianism. But another may think it can only be done (let us say) by giving the proven party professionals a greater voice. . . .

*Ripon*, 525 F.2d at 585 (footnote omitted).

A party may, of course, pay heavily at the polls for the perception that it treats its

members, delegates, or candidates unfairly. But that is a matter for the party to weigh, and for the people to decide in the general election. It is not a basis upon which a court can intervene as long as the party's processes rationally advance its legitimate interests.

Rule 11(K) and the Fowler letter were issued pursuant to the authority duly granted to the DNC and Chairman Fowler by the Charter and Bylaws of the Democratic Party.[35] If LaRouche disputed Fowler's authority or conclusions, the place to take that dispute was to the national convention's Credentials Committee and, if he received no satisfaction, to the floor of the convention itself.[36] As the Supreme Court said in *O'Brien*, "[i]t has been understood since our national political parties first came into being as voluntary associations of individuals that the convention itself is the proper forum for determining intra-party disputes as to which delegates shall be seated." 409 U.S. at 4, 92 S.Ct. 2718.[37] Because the First Amendment protects the decisions made by defendants in this case, we are unable to afford plaintiffs the relief they seek.[38]

## VI

The district court's dismissal of the complaint as to the District of Columbia Democratic Party, the District of Columbia Democratic State Committee, and the Chairman of the District of Columbia Democratic State Committee is affirmed. Plaintiffs' claims against the remaining defendants under section 5 of the Voting Rights Act are remanded to the district court for the convening of a three-judge court. The district court's dismissal of plaintiffs' claims under all other statutory and constitutional provisions is affirmed.

---

**35.** The Charter of the Democratic Party provides that "delegates shall be chosen ... according to the standards ... as may be specifically authorized by the Democratic National Committee in the Call to the Convention." *See* Charter of the Democratic Party of the United States art. 2, § 4 (1995) (J.A. 281). The Bylaws provide that "the Chairperson ... shall exercise authority delegated to him or her by the Democratic National Committee." *See* Bylaws of the Democratic Party of the United States § 12 (1995) (J.A. 296).

**36.** The Call for the 1996 Democratic National Convention provided that "[t]he Credentials Committee shall determine and resolve questions concerning the seating of delegates and alternates to the Convention.... The committee shall report to the Convention for final determination and resolution of all such questions." The Call for the 1996 Democratic National Convention art. VII(I)(1) (J.A. 325). The Convention is "the highest authority of the Democratic Party," Charter of the Democratic Party of the United States art. 2, § 2 (J.A. 281), and its adoption of the Credentials Committee report determines the final roll of those who may be seated at the Convention, *see* J.A. 277 (Boylan Aff.).

**37.** Since the Credentials Committee forum was available to resolve LaRouche's complaint before the contested delegates were formally seated, we reject his brief suggestion that the DNC deprived him of a liberty interest without an "opportunity to be heard," in violation of the Due Process Clause. In any event, our conclusion that the Constitution protects the decisions the Party made here would render such a procedural due process claim untenable. We also reject LaRouche's contention that Fowler's characterization of his political beliefs as "racist and anti-Semitic" deprived him of a "liberty" interest without due process of law. *See Siegert v. Gilley*, 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

**38.** This conclusion applies to plaintiffs' claims against all of the defendants, who include state party officials and committees as well as Fowler and the DNC. Plaintiffs' constitutional claims do not differentiate among the groups of defendants, nor do they suggest that the state defendants did anything other than obey the instructions of Fowler and the DNC.