El Juez Presidente Señor Hernández Denton
emitió la opi-nión del Tribunal.
“Las fuerzas que compiten en-tre sí dentro de un partido polí-tico emplean la campaña pri-marista y la elección primarista para finalmente arreglar sus diferencias .... Una primaria no es hostil a las luchas intra-par-tidistas; de hecho, son el foro ideal para resolverlas.” (Tra-ducción nuestra.) EU v. San Francisco Democratic Comm., 489 U.S. 214, 230-231 (1989).
El presente caso es una secuela de McClintock v. Rivera Schatz, 171 D.P.R. 584 (2007), en donde declaramos nulas las sanciones impuestas por el Partido Nuevo Progresista (PNP) en contra de los Senadores Kenneth McClintock Hernández, Jorge de Castro Font, Migdalia Padilla Alvelo, Luz Arce Ferrer y Carlos Díaz Sánchez (los Senadores o peticionarios). Después de dicha decisión, el PNP “no cua-lificó” a los Senadores como aspirantes a primarias, y pre-sentó ante el Tribunal de Primera Instancia una querella de descalificación. El foro de instancia la declaró “con *888 lugar”. De dicha decisión los peticionarios recurren ante nos vía certificación.
Por entender que la primaria es el foro más adecuado y democrático para resolver esta disputa entre electores afi-liados al PNP, y que la descalificación fue un subterfugio para eludir las consecuencias del dictamen emitido en McClintock v. Rivera Schatz, supra, revocamos la sentencia apelada y ordenamos la certificación de los Senadores como aspirantes en la contienda primarista a celebrarse el 9 de marzo de 2008.
I
Los peticionarios, De Castro Font, Padilla Alvelo, Arce Ferrer y Díaz Sánchez fueron electos Senadores bajo la insignia del PNP en los comicios electorales celebrados en Puerto Rico el pasado 2 de noviembre de 2004. Como resul-tado de un conflicto interno, el PNP celebró un proceso disciplinario contra ellos y contra el Senador Kenneth Mc-Clintock Hernández. Dicho proceso finalizó con la imposi-ción de diversas sanciones a éstos, entre las cuales figura-ron el relevo de toda posición de liderazgo, la expulsión y la prohibición de aspirar a cargos electivos bajo la insignia de la colectividad. En McClintock v. Rivera Schatz, supra, de-claramos la ilegalidad de dicho proceso, así como la nuli-dad de las sanciones impuestas a raíz del mismo.
Así las cosas, cuando los Senadores (con excepción del Senador McClintock Hernández) presentaron sus solicitu-des para figurar como aspirantes en las primarias de la colectividad, ciertos miembros del PNP se querellaron en su contra ante el Comité de Evaluación de Aspirantes a Cargos Públicos Electivos (Comité de Evaluación). Dichas querellas fueron atendidas y declaradas “con lugar” por el Comité de Evaluación.
En esencia, el Comité de Evaluación pasó juicio sobre numerosos cargos en contra de los Senadores basados en alegadas violaciones al Reglamento del PNP y a los acuer- *889 dos de la colectividad. Se alegó que ellos violaron el acuerdo de la Asamblea General y del Caucus del PNP en el Senado, dirigido a seleccionar al Dr. Pedro Rosselló Gon-zález para sustituir al Senador McClintock Hernández como Presidente de dicho cuerpo.
Tras celebrar vistas separadas para atender las quere-llas, el Comité de Evaluación concluyó que los Senadores incumplieron con el mandato de la colectividad de sustituir al Senador McClintock Hernández por el Senador Rosselló González como Presidente del Senado. A base de lo anterior, dicho Comité resolvió que éstos violaron el Regla-mento del PNP al no acatar sus decisiones institucionales y que, como consecuencia de ello, se “desafiliaron volunta-riamente” de la colectividad. Por ende, concluyó que éstos no pueden figurar en el Registro de Electores Afiliados del PNP, por lo que le recomendó al PNP “no cualificar” a los Senadores como aspirantes bajo la insignia del partido. Dicha recomendación fue acogida por el Directorio del PNP.
Mientras ocurría este proceso, los Senadores presenta-ron ante el Tribunal de Primera Instancia diversas solici-tudes dirigidas a lograr que se pusiera en vigor el dictamen emitido en McClintock v. Rivera Schatz, supra. Por su parte, el PNP presentó ante dicho foro una querella en la que solicitó su descalificación como aspirantes a primarias de la colectividad. El PNP fundamentó su solicitud, preci-samente, en la Resolución del Comité de Evaluación.
Trabada la controversia, el foro de instancia concluyó que el Comité de Evaluación no tiene autoridad para con-ducir un procedimiento disciplinario y que, por lo tanto, “no podía el Directorio darle la vuelta a la Opinión del Tribunal Supremo en el caso ... McClintock v. ... Rivera Schatz, supra, para emitir una decisión de expulsión dis-frazada de desafiliación voluntaria”. A pesar de ese recono-cimiento, el tribunal entró a considerar el alcance del de-recho a disentir que cobija a los Senadores según la Ley Electoral de Puerto Rico (Ley Electoral), en contraposición con la libertad de asociación que ampara al PNP. Con res- *890 pecto a ello, determinó que el derecho de los Senadores a disentir no puede tener un rango de mayor jerarquía que el del PNP a mantener su integridad, disciplina y unidad, "porque de lo contrario se plantaría ... una semilla de dis-cordia en el seno del partido”. Dicho foro entendió que “[u]na interpretación contraria, violentaría el derecho fundamental de los partidos a la libertad de asociación”.
De acuerdo con el mencionado análisis, el foro de ins-tancia determinó que la decisión del Comité de Evaluación —de que los Senadores violaron el Reglamento del PNP— no era arbitraria ni irrazonable. En consecuencia, declaró Con Lugar la querella de descalificación.
Inconformes, los Senadores apelaron ante el Tribunal de Apelaciones y, posteriormente, presentaron una Solicitud de Certificación ante nos para que se revise directamente la Sentencia emitida por el foro primario. Los peticionarios alegan que como consecuencia del dictamen emitido en McClintock v. Rivera Schatz, supra, el PNP está impedido de relitigar la capacidad de ellos para postularse en primarias bajo la insignia del PNP, ya que en dicha Opinión este Tribunal pasó juicio sobre las mismas imputaciones y deter-minó que la sanción de prohibirles participar en dicha etapa del proceso violenta los derechos que les garantiza la Ley Electoral. Consideran éstos que dicho proceder es un subterfugio para burlar la Opinión emitida por este Tribunal.
De otra parte, aducen que procede la revocación de la descalificación decretada en su contra porque el acuerdo que el PNP pretendió poner en vigor no fue sobre un asunto programático y que, además, es contrario al Regla-m'ento del Senado, que regula el proceso de selección del Presidente de dicho cuerpo. Siendo así, y dado que la Ley Electoral les garantiza el derecho a disentir en asuntos no programáticos ni reglamentarios, entienden que podían disentir en cuanto a este extremo.
Por su parte, el PNP aduce —en síntesis— que, como asociación voluntaria, tiene derecho a decidir quiénes son *891 sus miembros y quiénes no lo son. Sostiene que los Sena-dores violaron el acuerdo del Caucus y de la Asamblea General, por lo que el PNP podía disciplinarlos e imponerles la sanción de negarles figurar como candidatos a primarias bajo la insignia de la colectividad.
Oportunamente, acogimos la Solicitud de Certificación. Conscientes de la necesidad de una pronta solución, y a pesar de que ninguna de las partes lo solicitó, acortamos los términos para la presentación de los alegatos. Tanto el PNP como los Senadores comparecieron dentro del término concedido. A su vez, a petición de los Senadores y en auxilio de nuestra jurisdicción, le ordenamos al PNP paralizar el sorteo que determina las posiciones de los candidatos en las papeletas primaristas de la colectividad, en cuanto a los escaños a los que éstos aspiran. Contando con las posi-ciones de ambas partes, procedemos a resolver con la me-sura que el caso amerita.
Como el presente caso encierra una aparente tensión entre la libertad de asociación del PNP y los derechos ga-rantizados por la Ley Electoral, como cuestión de umbral examinaremos la validez de la decisión del Comité de Eva-luación de dicho partido. Para lograr ese cometido, debe-mos aclarar los derechos y las prerrogativas que, según las particulares circunstancias de este caso, se le deben reco-nocer tanto al partido como a los electores afiliados de la colectividad. La controversia ante nos requiere que delimi-temos el alcance de la libertad de asociación, el derecho al voto y las secciones pertinentes de la Ley Electoral. Ese ejercicio, claro está, tendrá como norte el valor principal tutelado por la Ley Electoral, a saber, el derecho del ciuda-dano a expresarse mediante el voto.
II
A. La libertad de asociación es un derecho expresamente reconocido por la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico. El propio *892 texto de la Ley Suprema declara que “ [1] as personas po-drán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares”. Art. II, Sec. 6, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 279. En armonía con esta normativa constitucional, hemos expresado que la libertad de asociación es un dere-cho fundamental que conlleva el derecho a formar agrupa-ciones y proponer candidatos de su predilección para par-ticipar en el proceso electoral. Véanse: P.S.P. v. Com. Estatal de Elecciones, 110 D.P.R. 400 (1980); García Passalacqua v. Tribunal Electoral, 105 D.P.R. 49 (1976). Véase, además, a modo ilustrativo, Sánchez y Colón v. E.L.A. II, 134 D.P.R. 503, 508 (1993), opinión de conformidad del Juez Presidente Andréu García.
Como corolario de la libertad de organización, la misma Constitución contempla en diversas disposiciones la fun-ción protagónica que juegan los partidos políticos en nues-tro sistema electoral.(1) De hecho, el sistema republicano de gobierno diseñado por la Ley Fundamental parte de la premisa —en el esquema de representación legislativa es-tablecido por el Art. Ill— que los partidos políticos consti-tuyen un elemento integral de nuestro ordenamiento constitucional.
Son las organizaciones políticas las que dirigen el debate sobre los asuntos públicos frente a las contiendas electorales, presentando sus respectivos programas de gobierno y nominando candidatos para ocupar los cargos públicos principales que ofrecen gobernar en consonancia con esos programas. McClintock v. Rivera Schatz, supra, pág. 14; P.A.C. v. P.I.P., 169 D.P.R. 775 (2006); P.R.P. v. E.L.A., 115 D.P.R. 631, 638 (1984); Fuster v. Búso, 102 D.P.R. 327, 347 (1974). Todo ello con la anuencia de la Ley Electoral, que delega expresamente en tales asociaciones la función inherentemente pública de estructurar algunos aspectos *893 primordiales del esquema electoral, así como autoriza la subvención con fondos públicos de una partida significante de los gastos operacionales y publicitarios de los partidos. Véase 16 L.P.R.A. sees. 3001-3380. Véanse, además: McClintock v. Rivera Schatz, supra, pág. 15; R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. C. Abo. P.R., 2003, Vol. II, págs. 1205-1206.
A su vez, la existencia de los partidos políticos en nuestra jurisdicción está intrínsecamente relacionada al derecho al voto, consagrado expresamente en nuestra Constitución. La See. 2 de la Carta de Derechos establece el sufragio universal, igual, directo y secreto, y protege al ciudadano contra toda coacción en el ejercicio de esa prerrogativa. Art. II, Sec. 2, Const. E.L.A., supra.(2) Este precepto constitucional le concede a todo ciudadano el derecho a participar en el proceso electoral, elemento umbral de nuestro sistema democrático. P.A.C. v. E.L.A. I, 150 D.P.R. 359 (2000).
En nuestro ordenamiento constitucional, el derecho al voto no tan sólo comprende el derecho del elector a votar en las elecciones, sino que abarca el derecho a que se incluyan en las papeletas las opciones que reflejan las corrientes políticas contemporáneas del elector. McClintock Hernández v. Rivera Schatz, supra, págs. 23-24; P.A.C. v. E.L.A. I, supra, pág. 372; Ortiz Angleró v. Barreto Pérez, 110 D.P.R. 84 (1980).(3) Es por ello que el derecho al voto, al igual que la libertad de asociación, comprende el derecho a formar y a afiliarse a agrupaciones políticas con la inten-ción de participar en el proceso electoral.
Ahora bien, aunque es indudable que tanto el derecho a votar de una manera determinada como el derecho a formar asociaciones políticas para propósitos electorales *894 son derechos de carácter fundamental, éstos no constitu-yen derechos absolutos. P.A.C. v. E.L.A. I, supra; Ramírez de Ferrer v. Mari Brás, 144 D.P.R. 141 (1997); Democratic Party v. Tribunal Electoral, 107 D.P.R. 1 (1978). La propia Constitución circunscribió estos principios constitucionales al mandato legislativo al disponer que la Asamblea Legis-lativa “dispondrá por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas”. Art. VI, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 407. Por lo tanto, hemos reconocido que el Art. VI, See. 4 de la Cons-titución delega a la Asamblea Legislativa un margen de autoridad amplio y abarcador para legislar en asuntos de materia electoral. McClintock v. Rivera Schatz, supra, pág. 15; PA.C. v. P.I.P, supra, pág. 22; P.A.C. v. E.L.A. I, supra, pág. 372; P.S.P., P.P.D., P.I.P. v. Romero Barceló, 110 D.P.R. 248 (1980); P.N.P. v. Tribunal Electoral, 104 D.P.R. 741 (1976).
Mediante esta autoridad constitucional, el Estado puede cumplir efectivamente con el interés apremiante de proteger la pureza del proceso electoral y la integridad del sistema democrático. Como consecuencia de ello, la Asamblea Le-gislativa tiene la facultad y la obligación de aprobar aque-lla reglamentación que salvaguarde el derecho al voto y que propenda a la realización de un proceso electoral justo, or-denado, libre de fraude, honesto, íntegro y democrático. Véanse: McClintock v. Rivera Schatz, supra, pág. 24; P.A.C. v. E.L.A. L, supra, pág. 371; P.S.P. v. Com. Estatal de Elecciones, supra, págs. 405-406; P.S.P, P.P.D., P.I.P. v. Romero Barceló, supra, pág. 294; P.N.P. v. Tribunal Electoral, supra, págs. 749-750.
Por otro lado, los partidos políticos que participan en las elecciones generales están investidos de poderes cuasigubernamentales, toda vez que forman parte del organismo directivo de la Comisión Estatal de Elecciones y, a su vez, reciben anualmente cuantiosos fondos públicos del Fondo Electoral, además de los que devengan en el año de *895 las elecciones generales. Al inscribirse como partidos con derecho a nombrar un Comisionado Electoral y recibir fon-dos públicos para sus gastos, aceptan también la obligación de cumplir con el ordenamiento electoral. Véase McClintock v. Rivera Schatz, supra, págs. 15-16. Véase, además, a modo ilustrativo, Smith v. Allwright, 321 U.S. 649 (1944).
B. Según los principios constitucionales antes señala-dos, nos corresponde examinar la regulación de los parti-dos políticos por el ordenamiento electoral y la posible ten-sión que emana como consecuencia del mismo entre el derecho al voto y la libertad de asociación. Al examinar esta normativa, partimos de la premisa que ninguna de las partes ha cuestionado la validez constitucional de las dis-posiciones de la Ley Electoral. En consonancia con nuestros pronunciamientos en McClintock Hernández v. Rivera Schatz, supra, reiteramos que la Asamblea Legislativa aprobó esta normativa para salvaguardar la integridad del proceso electoral puertorriqueño, reconociendo la prevalen-cia de los derechos electorales del ciudadano sobre los de-rechos y prerrogativas de todos los partidos y agrupaciones políticas. 16 L.P.R.A. sec. 3051(11).
En primer lugar, la Declaración de Derechos y Prerrogativas de los Electores consagrada en el Art. 2.001 de la Ley Electoral, reconoce “[e]l derecho del elector afiliado aspirante a una candidatura a solicitar primarias de su partido y la celebración de las mismas con arreglo a las garantías, derecho[s] y procedimientos establecidos en este subtítulo”. 16 L.P.R.A. see. 3051(8). Ya sostuvimos en McClintock Hernández v. Rivera Schatz, supra, la validez de dicha disposición, así como la obligación del partido político a participar en un proceso primarista cuando surja más de un aspirante idóneo para un cargo, al amparo del Art. 4.006 de la Ley Electoral, 16 L.P.R.A. see. 3156.
En dicha ocasión reiteramos que el derecho a ser candidato y a comparecer en la papeleta no son derechos fundamentales. McClintock v. Rivera Schatz, supra, pág. *896 21; P.A.C. v. E.L.A. I, supra; García v. Luciano, 115 D.P.R. 628, 630 (1984). No obstante, aclaramos que la ley tutela que el elector afiliado tenga el derecho estatutario a que se le considere para ser nominado por su partido como candi-dato a cualquier cargo electivo. En la siguiente oración del mencionado Art. 4.006, se establece que “[a] fin de garan-tizar este derecho, todo partido político tendrá que partici-par en primarias en aquellos casos en que surja más de un candidato idóneo, según lo establecido en este subtítulo y ninguna disposición reglamentaria del partido podrá violar este derecho”. 16 L.RR.A. sec. 3156.(4) Conforme al Art. 4.014 de la Ley Electoral, 16 L.P.R.A. see. 3164, constituye candidato idóneo un elector afiliado que figure en el regis-tro de miembros afiliados al partido, que preste juramento en el que acepte ser postulado como candidato y acatar el reglamento de su partido, y que cumpla tanto con los re-quisitos constitucionales aplicables al cargo como con los otros requisitos formales.(5)
Por otro lado, el Art. 2.001 de la Ley Electoral también garantiza “[e\l derecho de todo elector afiliado a disentir respecto de las cuestiones de su respectiva colectividad política que no sean de naturaleza programática o reglamentaria”. (Enfasis suplido.) 16 L.P.R.A. see. 3051(6). *897 No obstante, en armonía con la libertad de asociación, la regulación estatutaria vigente permite exigir a los afilia-dos la aceptación y el cumplimiento con los reglamentos y el programa de gobierno del partido político como requisito para la afiliación.
Sin cierta disciplina interna, basada en criterios razona-bles de ideología, es imposible que el partido aspire a la consecución de sus objetivos. F. Flores Giménez, La demo-cracia interna de los partidos políticos, [sin ed.], Madrid, Publicaciones del Congreso de los Diputados, 1998, págs. 178-184. De hecho, la Ley Electoral faculta al partido, en el ejercicio de su derecho a la asociación, a establecer los límites programáticos y reglamentarios que estime conve-nientes y, en consecuencia, tiene la potestad de conocer cada solicitud de afiliación y calificación para decidir al respecto de acuerdo con la idoneidad del aspirante. Véase 16 L.P.R.A. sees. 3157 y 3167. Por ello, hemos reconocido que los partidos están facultados para identificar a las per-sonas que deseen formar parte de su membresía, así como deben tener potestad de disciplinar, descalificar y expulsar a quienes se aparten de sus criterios fundamentales de asociación, siempre y cuando se cumpla con el debido pro-ceso de ley. McClintock Hernández v. Rivera Schatz, supra, pág. 18.
Ahora bien, el derecho a disentir que provee la Ley Electoral sobre asuntos no programáticos ni reglamentarios no puede ser vaciado de contenido ante los poderes asociativos de la agrupación política. El pluralismo y el derecho al voto, como valores superiores del ordenamiento jurídico, deben integrarse en el concepto de democracia interna de los partidos políticos.
De hecho, nuestra Ley Electoral está cimentada en dichos principios que le conceden una clara primacía a las primarias como el mecanismo más adecuado para dirimir conflictos intrapartidistas de carácter político. Es por ello que “la organización interna y el funcionamiento de las asociaciones deben ser democráticos, con pleno respeto al *898 pluralismo”. D. Bautista Plaza, La función constitucional de los partidos políticos, Ira ed., Granada, Ed. Comares, S.L., 2006, pág. 88. De esta manera, nuestro ordenamiento
electoral dispone unas salvaguardas para evitar la partidocracia. (6)
En ese sentido, y de modo ilustrativo, es preciso señalar lo que el Tribunal Supremo federal ha esbozado:
"... contending forces within the party employ the primary campaign and the primary election to finally settle their differences” .... A primary is not hostile to intraparty feuds; rather it is an ideal forum in which to resolve them. EU v. San Francisco County Democratic Central Comm., supra, pág. 227. Véanse: Storer v. Brown 415 U.S. 724 (1974); American Party of Texas v. White, 415 U.S. 767 (1974).(7)
De hecho, se ha sostenido que los estados no pueden promulgar leyes electorales para mitigar el sectarismo y la disidencia interna en los partidos, dado a que reconoce que el proceso de las primarias es el mecanismo adecuado para resolver las diferencias políticas entre los electores afilia-dos a un partido y para identificar los candidatos que lo *899 representarán en las elecciones generales. Véanse, a modo ilustrativo: EU v. San Francisco Democratic Comm., supra; Ripon Society, Inc. v. National Republican Party et al., 525 F.2d 567, 601 (1975), cert. denegado, 424 U.S. 933 (1976). Véase, además, R.H. Pildes, Foreword: The Constitutionalization of Democratic Politics, 118 (Núm. 1) Harv. L. Rev. 28 (2004).
Para denegar una solicitud de afiliación o calificación de un aspirante a primarias que ha cumplido con los requisitos formales antes discutidos, el órgano rector del partido debe adoptar como criterio, por lo tanto, la existencia de manifestaciones o conductas del solicitante que muestren intenciones incompatibles con el programa y el reglamento de la agrupación política. Sin embargo, si la motivación de tal sanción se enfrenta directamente a la Constitución o a la Ley Electoral por arbitraria o desproporcionada, podría dar pie en situaciones excepcionales a la intervención judicial para garantizar los derechos democráticos establecidos en la referida ley. Véase 16 L.P.R.A. see. 3051.
En otras palabras, más allá del programa y de los reglamentos del partido, tanto la Asamblea Legislativa como la Comisión Estatal de Elecciones y las agrupaciones políticas pueden imponer un catálogo de requisitos formales secundarios para los aspirantes a primarias.(8) Lo que los reglamentos de un partido político no pueden disponer son requisitos que desprecien el principio constitucional de no discriminación o de igual protección, como los que tengan por fundamento la raza o género, o que quebranten el principio democrático que permea todo el esquema estatutario relacionado al proceso electoral. Por lo tanto, los par- *900 tidos no pueden imponer requisitos que vulneren el derecho al voto de los afiliados a la organización política, exclu-yendo de las papeletas a primarias las opciones que reflejan las corrientes políticas contemporáneas del elector de ese partido.
De así hacerlo, se activa la autoridad de los tribunales para intervenir en tales disputas entre los electores afilia-dos frente a su partido. McClintock v. Rivera Schatz, supra, pág. 16.(9) De hecho, la propia Ley Electoral le confiere jurisdicción a los tribunales en los procedimientos de des-calificación de candidatos a primarias. Véase 16 L.P.R.A. see. 3157. El propio PNP así lo reconoció cuando acudió ante el Tribunal de Primera Instancia para solicitar que dicho foro descalificara judicialmente a los Senadores e im-pidiera que sus nombres se incluyeran en la papeleta primarista.
Partiendo de este marco normativo, resolvemos la con-troversia ante nuestra consideración.
III
A. En el caso de autos, los Senadores invocan su dere-cho a disentir al amparo del Art. 2.001(6) de la Ley Electoral, supra, ya que el asunto de la Presidencia del Senado no era de naturaleza programática ni reglamentaria al mo-mento de los hechos. Además, sostienen que no pueden ser descalificados de la papeleta primarista por incumplir con los mandatos de la Asamblea General y del Caucus del PNP en el Senado, dado que tales directrices carecían de *901 fuerza legal y reglamentaria. Aducen que al no estar va-cante la Presidencia del Senado de Puerto Rico, no había que seleccionar a un nuevo Presidente. Además, arguyen que el Presidente del Senado de Puerto Rico es elegido por los miembros de ese cuerpo y no por los organismos recto-res de un partido.
El Reglamento del Senado de Puerto Rico —aprobado a principios del cuatrienio mediante votación unánime— dis-pone que el Presidente de dicha cámara “será el jefe ejecu-tivo del Cuerpo en todos los asuntos legislativos y adminis-trativos durante todo el cuatrienio para el cual fue electo”. (Énfasis suplido.) Sec. 6.1(a) del Reglamento del Senado, R. del S. 11 de 10 de enero de 2005. A su vez, define al Presi-dente en propiedad como aquel miembro oficialmente electo por el Cuerpo para asumir el cargo, y especifica que se ele-girá por la mayoría de los miembros que componen el Cuerpo mediante votación secreta en la Sesión Inaugural. Secs. 5.3(h) y 6.2(a) del Reglamento del Senado, supra. El propio reglamento no provee para la sustitución de dicho funcionario, excepto como consecuencia de su renuncia, re-moción o muerte. See. 5.2 del Reglamento del Senado, supra.
Por otro lado, el Art. 45 del Reglamento del Partido Nuevo Progresista dispone que el Caucus de cada cámara legislativa estará compuesto por los legisladores electos del Partido que mantengan los niveles de disciplina institucio-nal conforme a la Declaración de Propósitos y lealtad al Programa de Gobierno, a los reglamentos, acuerdos, reso-luciones y decisiones del partido. Además, el referido artí-culo establece que
Dios acuerdos del Caucus ... obligarán a todos los legisladores del Partido, independientemente de su posición personal en el seno del Caucus o de la Conferencia Legislativa, según sea el caso, excepto, cuando los mismos sean contrarios a las dispo-siciones de este Reglamento, al Programa de Gobierno, a la Ley, la moral o 'el orden público. El Caucus de cada Cámara, así como el Directorio, podrá tomar la acción disciplinaria que considere adecuada contra cualquier legislador que viole los *902 acuerdos del Caucus o de la Conferencia Legislativa. (Énfasis suplido.) íd.(10)
En atención a lo anterior, la delegación del PNP en el Senado celebró un Caucus el 7 de enero de 2005, en el cual acordaron elegir al Senador McClintock Hernández al puesto de Presidente del Senado. Posteriormente, durante la Sesión Inaugural celebrada el 10 de enero de 2005, el Senador McClintock Hernández fue formalmente electo por los miembros de esta cámara legislativa a fungir como Presidente del Senado. Cinco meses después, el Caucus de dicho partido y la Asamblea General d,el PNP le “ordena-ron” a los Senadores que sustituyeran a McClintock Her-nández por el doctor Rosselló González en la Presidencia del Senado.
Conforme a las disposiciones reglamentarias del Se-nado, una vez los miembros del cuerpo legislativo eligen el Presidente del Senado, el asunto deja de ser interno de la delegación del partido de mayoría y no se rige por los re-glamentos aplicables al Caucus de dicha delegación. Desde ese momento, la Presidencia del Senado rebasa las conside-raciones partidistas para responder exclusivamente al cuerpo legislativo completo, por lo que se rige por las dis-posiciones de la Constitución del Estado Libre Asociado, las leyes y los reglamentos establecidos en referencia a esta rama de gobierno. Claramente, una vez el Senado elige su Presidente, la remoción de dicho funcionario es un asunto interno del Cuerpo que no puede servir de justifica-ción para descalificar a un elector afiliado que desea ejer-cer su derecho a participar en una primaria.
Por lo tanto, el mandato de la Asamblea General del PNP y la determinación posterior del Caucus para que se sustituyera al Senador McClintock Hernández por el Dr. Rosselló González en la Presidencia del Senado son incompatibles con el Reglamento del Senado de Puerto Rico y el *903 ordenamiento constitucional que rige la Rama Legislativa. Indudablemente, los partidos no se pueden inmiscuir directamente en los asuntos constitucionalmente delegados a una rama del sistema republicano de gobierno. Es por ello que el PNP no podía interferir directamente en la decisión sobre si procedía remover al Presidente del Senado.
Dicho de otro modo, el asunto de la Presidencia del Se-nado no responde a principios programáticos ni reglamen-tarios, sobre todo si tomamos en cuenta que en la etapa que nos concierne dicho asunto es injerencia del Senado en Pleno y no de los partidos. A su vez, ni el programa de gobierno del PNP ni sus reglamentos consideran el asunto del liderato legislativo. Aunque la Asamblea General y el Caucus de la colectividad en el Senado impartieron unas instrucciones políticas, tales mandatos no eran legalmente vinculantes y, por lo tanto, no pueden servir de base para una sanción que atente contra el derecho al voto de los electores afiliados a la colectividad. Siendo así, es merito-rio concluir que los Senadores disintieron sobre un asunto que no es de naturaleza programática ni reglamentaria.
Por ende, una sanción impuesta por los organismos directivos del Partido por no obedecer una instrucción de ese calibre sería una decisión contraria al ordenamiento electoral puertorriqueño. Ciertamente, no estamos ante una situación en donde los electores afiliados profesan ideales políticos incompatibles con los fines programáticos del PNP. De hecho, no se desprende del expediente que los Senadores profesen lealtad a otro partido o marco político incongruente con los objetivos fundamentales del pro-grama y del reglamento de la colectividad. Más bien, el caso de autos versa sobre unas fuerzas intrapartidistas que compiten entre sí por posiciones de poder y cargos elec-tivos en representación de la colectividad y del electorado que los eligió. El esquema electoral estatutario vislumbró el derecho a las primarias precisamente para los supuestos como el de autos, para que sea exclusivamente el universo *904 de los electores afiliados al PNP los que decidan las conse-cuencias y el futuro político de todos sus candidatos.
Por lo tanto, al ser aún electores afiliados al partido, los Senadores peticionarios tienen el derecho estatutario a exi-gir primarias, así como el derecho a disentir sobre asuntos no programáticos y no reglamentarios, a menos que no cumplan con los requisitos formales descritos anterior-mente. Ambas normativas responden al interés apre-miante del Estado de salvaguardar el derecho al voto de los electores afiliados a que se incluyan en las papeletas las opciones que reflejan las corrientes políticas contem-poráneas.
Los partidos no deben temerle a las primarias como instrumento para resolver este tipo de disputa política intrapartidista. Así lo indicamos en McClintock v. Rivera Schatz, supra, págs. 22-23:
“los procesos primaristas deben entenderse como el meca-nismo más apropiado para avanzar la democratización de la vida pública y hacer más transparente la toma de decisiones colectivas que habrán de afectar al país. Las primarias rom-pen con la disciplina férrea que los partidos le imponen a sus militantes, fomentan la introducción de ideas nuevas en el foro público, adelantan el debate político, y aseguran una mayor igualdad del elector”.
El proceso de las primarias —requerido por la Ley Electoral cuando surge más de un candidato idóneo y cuando no se viabilice algún método alterno de selección de candi-datos según contempla la referida ley— es el modelo que mejor garantiza la participación directa de los electores afi-liados en la designación de candidatos a cargos públicos y de los dirigentes del partido.(11) Por ende, las primarias son *905 la máxima expresión democrática del derecho a la asocia-ción y el vehículo procesal idóneo para reivindicar el dere-cho al voto.(12)
Este requisito de celebración de primarias, que emana directamente del andamiaje estatutario electoral, consti-tuye un objetivo meritorio, fundamental y apremiante cuando se canaliza por normas precisas y restrictas, como las que debidamente establecen las mencionadas disposi-ciones de la Ley Electoral.(13) A su vez, este interés está totalmente desconectado de la supresión de la expresión de la asociación política, y la celebración de primarias repre-senta, en efecto, el medio menos restrictivo para alcanzarlo. Dado que la función que ostentan los partidos en el proceso electoral puertorriqueño está investida de po-deres cuasigubernamentales, únicamente las agrupaciones políticas que satisfagan en su estructura los parámetros *906 que contempla la Ley Electoral pueden brindar la garantía que la autoridad gubernamental se deriva del pueblo.(14) Así, pues, resulta evidente que el procedimiento de desca-lificación instado por el PNP contra los cuatro Senadores no cumple con las exigencias antes mencionadas.
El presente caso no trata de una controversia entre un partido y electores no afiliados, sino sobre los parámetros mínimos de democracia interna que la Ley Electoral exige a las agrupaciones políticas para la selección de candidatos de cara a las elecciones generales. Al tratarse de miembros afiliados, el Estado puede requerir que el partido se rija por procedimientos democráticos y que el liderato responda directamente a una membresía informada. Tal regulación es-tatal no infringe la libertad de asociación porque no se en-frenta a las determinaciones relacionadas al contenido del programa o del reglamento de la colectividad.
Lo expuesto anteriormente tampoco implica que un par-tido político no pueda ejercer su derecho constitucional a la libertad de expresión para impartir instrucciones políticas a sus miembros afiliados y endosar o hacer campaña en contra de las candidaturas y el liderato de su preferencia. Véase, a modo ilustrativo, EU v. San Francisco Democratic Central Comm., supra.
B. Por último, no somos tan ingenuos para ignorar que, en esencia, lo que hizo el Comité de Evaluación del PNP fue disciplinar nuevamente a los Senadores con los mismos cargos que dieron lugar a las sanciones que anula-mos en McClintock v. Rivera Schatz, supra. De hecho, las imputaciones medulares incluidas en las dos querellas que sirvieron de base al proceso ante el Comité de Evaluación coinciden, esencialmente, con las que dieron lugar al pro-ceso disciplinario que una vez anulamos. Asimismo, en las *907 querellas presentadas ante dicho Comité se incluyeron como anejos las querellas anteriores y se incorporaron to-das las alegaciones allí esbozadas.
Más aún, el Comité de Evaluación —al hacer el tras-fondo del caso— hizo alusión únicamente al acuerdo —ale-gadamente desacatado por los Senadores— dirigido a esco-ger al doctor Rosselló González como Presidente del Senado para sustituir al Senador McClintock Hernández. En síntesis, ese fue el único hecho sobre el cual el Comité de Evaluación pasó juicio, el cual también sirvió de funda-mento para el proceso disciplinario. Al así hacerlo, el Co-mité de Evaluación se basó en las determinaciones anterio-res que fueron invalidadas por este Foro para concluir que los Senadores peticionarios se “desafiliaron voluntaria-mente” del PNP.
Como ya mencionamos, los partidos pueden expulsar y sancionar a sus miembros, siempre y cuando las razones para ello no sean contrarias a la ley y se siga un procedi-miento que provea las garantías del debido proceso de ley. A pesar de ello, el Comité de Evaluación cimentó su deci-sión de “no cualificar” a los Senadores en la llamada “de-safiliación voluntaria”, determinación que no es propia de un proceso ante dicho organismo. Nótese que el propio Re-glamento del Partido Nuevo Progresista, en su Art. 98, le reserva al Directorio la facultad de disciplinar a los miem-bros afiliados que ocupan el cargo de legislador. A su vez, el Reglamento delega en el Comité de Evaluación única-mente la tarea de “evaluar los méritos y requisitos de los aspirantes a cargos públicos por elección”. Art. 53 del Reglamento del PNP, supra.
Dado que la decisión de “no cualificar” se basó en deter-minaciones inherentes al proceso disciplinario que dejamos sin efecto, y ya que no se ha reiniciado trámite disciplina-rio alguno, entendemos que mediante el proceso ante el Comité de Evaluación el PNP diseñó un subterfugio para eludir el cumplimiento de nuestro dictamen. En McClintock v. Rivera Schatz, supra, pág. 26, expresamente *908 dispusimos que “el PNP no puede utilizar su facultad de disciplinar a sus electores afiliados como un subterfugio para coartar el derecho del miembro elector a solicitar pri-marias de su partido”. Por ende, el foro de instancia erró al declarar “con lugar” la solicitud de descalificación de los Senadores.
Ahora bien, como mencionamos anteriormente, nuestra determinación no impide que ni el liderato del partido ni la propia colectividad expresen públicamente su posición ins-titucional con respecto a las candidaturas de los peticionarios. Es mediante las primarias que las fuerzas que compiten entre sí dentro de un partido tienen la opor-tunidad de exponer su posición ante sus afiliados para que éstos, en última instancia, resuelvan dicha lucha política mediante su voto.
IV
En conclusión, como cuestión de derecho constitucional puertorriqueño, la libertad de asociación no es un derecho absoluto, por lo que puede tener limitaciones. Nuestra Ley Electoral es la disposición legal que regula este asunto. Establece como limitaciones, entre otras, el derecho de los electores afiliados a un partido político a participar de pri-marias en las que compitan por representar a su partido y el derecho a disentir en asuntos no programáticos o no reglamentarios. Aunque un partido político tiene, como co-rolario de su derecho a la asociación, la facultad de deter-minar quiénes pueden aspirar a ser nominados como can-didatos a unas elecciones generales, dicha facultad no puede descansar en la absoluta discreción del organismo directivo central de la colectividad ni en criterios irrazona-bles o arbitrarios.
En el presente caso hemos concluido que el Comité de Evaluación no tenía facultad para desafiliar a los Senado-res Jorge de Castro Font, Migdalia Padilla Alvelo, Luz Arce Ferrer y Carlos Díaz Sánchez. Ninguno retó el programa *909 de gobierno del PNP, según se deduce del propio expediente ante nuestra consideración. Siendo ello así, éstos permanecen como electores afiliados al PNP y, por ende, le asisten todos los derechos y prerrogativas que la Ley Electoral les garantiza. Dicha solicitud de descalificación fue un intento del PNP de eludir nuestra decisión en McClintock v. Rivera Schatz, supra, en la cual anulamos las san-ciones impuestas por la colectividad contra los Senadores.
Por consiguiente, se declara “con lugar” la apelación y se revoca el dictamen recurrido. Se les ordena a Elias Sán-chez, Secretario General del Partido Nuevo Progresista, y a Ramón Bauzá, Comisionado Electoral de la colectividad, que certifiquen a los Senadores como aspirantes en las pri-marias y radiquen las certificaciones correspondientes ante la Comisión Estatal de Elecciones.

Se dispone, además, que será nula cualquier actuación de parte de los recurridos dirigida a impedir o evitar que los Senadores figuren en la papeleta de las primarias que se celebrarán el 9 de marzo de 2008. De así actuar, el Par-tido Nuevo Progresista se colocaría al margen de la ley.

Se dictará sentencia correspondiente.

Así lo pronuncia y manda el Tribunal y certifica la Se-cretaria del Tribunal Supremo. El Juez Asociado Señor Rivera Pérez disintió con opinión escrita.

 Véase Art. III, Secs. 4, 7 y 8, Art. V, Sec. 12, y Art. VI, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1.

 Véase, además, M. Pabón y otros, Los derechos y los partidos políticos en la sociedad puertorriqueña, Río Piedras, Ed. Edil, 1968, págs. 7-11.

 Véase, además, a modo ilustrativo, Lubin v. Panish, 415 U.S. 709 (1979).

 Las reglas de hermenéutica nos conducen a concluir que la “consideración” que contempla la Ley Electoral de Puerto Rico (Ley Electoral) en este artículo se refiere a la prerrogativa de todos los electores afiliados a nominar al candidato oficial para los comicios generales mediante el proceso de primarias o algún método alterno de selección, conforme a lo dispuesto por el Art. 4.006-Ade la referida ley, 16 L.P.R.A. sec. 3156a. De hecho, en esa ocasión aclaramos que al asegurar que todo elector afiliado del partido tenga acceso al proceso de primarias, la Ley Electoral pretende proteger el derecho de todo elector a votar de forma efectiva, además que propende a un sistema electoral justo y honesto. McClintock v. Rivera Schatz, 171 D.P.R. 584 (2007).

 Entre los otros requisitos formales para ser considerado como elector en Puerto Rico se encuentran: ser Ciudadano de Estados Unidos o de Puerto Rico, estar domiciliado en la Isla, tener dieciocho años a la fecha de la elección, estar debida-mente inscrito antes de ésta y no haber sido declarado judicialmente incapaz. 16 L.P.R.A. see. 3053. Aparte de ser un elector calificado, la Ley Electoral establece otros principios esenciales de toda candidatura. Véase 16 L.P.R.A. see. 3151. Los partidos pueden “cualificar” la idoneidad de los candidatos siempre y cuando sus disposiciones reglamentarias para tales efectos no contravengan los derechos y pre-rrogativas que surgen de la Ley Electoral.

 Véase, a modo comparativo, la Constitución española y su disposición rela-tiva a los partidos políticos. Art. 6 de la Constitución española de 1978. Véase, ade-más, el Art. 21 de la Constitución alemana. Grundegesetz [GG] [Constitución], art. 21, Í949 (Ley Fundamental de Bonn).

 La controversia de autos se distingue analíticamente de los otros casos fede-rales invocados por el Partido Nuevo Progresista, donde el valor examinado siempre es el derecho de los no afiliados a participar en los procesos internos de la agrupación política. Véase, a modo ilustrativo, Tashjian v. Republican Party of Connecticut, 479 U.S. 208 (1986); Democratic Party of U.S. v. Wisconsin, 450 U.S. 107 (1981); Rosario v. Rockefeller, 410 U.S. 752 (1973); Cousins v. Wigoda, 419 U.S. 477 (1975). Véase, además, D. Hays Lowenstein, Associational Rights of Major Political Parties: A Skeptical Inquiry, 71 (Núm. 7) Tex. L. Rev. 1741 (1993); Nota, Primary Elections and the Collective Right of Freedom of Association, 94 (Núm. 1) Yale L.J. 117 (1984).
Los únicos casos que cita' el PNP con hechos relativamente similares a la acción de descalificación bajo nuestro escrutinio se distinguen claramente del caso de autos, pues ninguno involucraba a electores previamente afiliados y mucho menos electos por el mismo partido. LaRouche v. Fowler, 152 F.3d 974 (Cir. D.C. 1998); Duke v. Messey, 87 F.3d 1226 (limo Cir. 1996); Belluso v. Poythress, 485 F. Supp. 904 (1980). En todos estos casos, los tribunales federales validaron la actuación del partido a base de que los solicitantes eran personas desafiliadas con principios ideológicos adversos a la colectividad, por lo cual su inclusión podría distorsionar las decisiones colectivas y las funciones esenciales de la agrupación política. Además, el reclamo de asociarse con quien no desee hacerlo no es un derecho cobijado por la Primera En-mienda de la Constitución federal.

 Entre estos requisitos formales para dirimir la idoneidad de los aspirantes a. primarias, se encuentran la radicación de endosos, la certificación del Departamento de Hacienda de que ha rendido planillas de contribución sobre ingresos en los últi-mos diez años, y no haber sido convicto de ciertos delitos. Véase, por ejemplo, Regla-mento de la Comisión Estatal de Elecciones para los Procesos de Radicación de Can-didaturas y las Primarias de los Partidos Políticos de 25 de mayo de 2007.

 A tales efectos, el profesor Richard Pildes expresa lo siguiente:
“[CJonstitutional law must play a role in constraining partisan or incumbent self-entrenchment that inappropriately manipulates the ground rules of democracy. That functional justification for judicial review will be present in all constitutional democracies. External institutions, including courts, are needed to ensure that the background conditions that sustain democracy, particularly the absence of artificial barriers to robust partisan political competition, remain properly structured.” R.H. Pildes, Foreword: The Constitutionalization of Democratic Politics, 118 (Núm. 1) Harv. L. Rev. 28, 154 (2004).

 A su vez, el Art. 8 del Reglamento del Partido Nuevo Progresista de 10 de enero de 2005 dispone la obligación de todo miembro del Partido de acatar y cumplir con las resoluciones y acuerdos aprobados por la Asamblea General.

 En su análisis de los partidos políticos estadounidenses —los cuales fueron los primeros en utilizar el proceso primarista para elegir a sus candidatos— Jean Louis Seurin destaca que es en las primarias donde realmente se determina la con-dición de membresía del partido. J.L. Seurin, “La structure interne des partis poli-tiques amérieains”, Cahiers de la Fondation des Sciencies Politiques, Núm. 42,1953, pág. 28. Véase, además, Pildes, supra, págs. 102-103.
*905 Por otro lado, el profesor Bruce Ackerman señala acertadamente que el surgi-miento del sistema de primarias fue en gran medida responsable de la democratiza-ción de la política estadounidense:
“Over the course of the twentieth century, the rule of party leaders was increasingly checked and balanced by the decisions of primary voters. There are still states where party leaders huddle together in (smoke-free) rooms and wheel and deal over a slate of nominees. Yet these leaders are anxiously aware that their choices may be overturned by primary challengers who refuse to bow to their decisions.” B. Acker-man, Voting with dollars: a new paradigm for campaign finance, Yale University Press, 2002, pág. 162.

 Al sugerir la implantación de un sistema de primarias en Puerto Rico, el ex gobernador Luis Muñoz Marín expresó que el esquema anterior no estaba a la altura de las exigencias democráticas de la época. Para tales efectos, el ex gobernador ex-presó lo siguiente:
“ Una buena legislación de primarias en Puerto Rico debe preservar la respon-sabilidad del Partido, y precaver contra la viciosa formación de grupos impropios del proceso democrático. En la elección se votan programas sostenidos por Partidos; en la primaria se votan hombres para honrar programas.’ ” Mensaje de Luis Muñoz Marín a la segunda Asamblea Legislativa el 26 de febrero de 1953, en R.W. Anderson, Gobierno y Partidos Políticos en Puerto Rico, Madrid, Ed. Tecnos, 1970, pág. 43.

 Véase, a modo ilustrativo, Rosario v. Rockefeller, supra. En dicho caso, el Tribunal Supremo federal reconoció que el Estado tiene un interés apremiante en preservar la integridad del proceso electoral. Este foro también ha establecido que el Estado puede implantar restricciones que protejan la integridad electoral del proceso primarista. En American Party of Texas v. White, 415 U.S. 767 (1974), se validó un requisito para que los partidos principales nominen a sus candidatos mediante pri-marias, mientras que los partidos más pequeños seleccionen a los mismos en convenciones. Véase, además, J. Hart Ely, Democracy and Distrust: A Theory of Judicial Review, Cambridge, Harvard University Press, 1980.

 Como ya indicamos, este requisito de democracia interna para los partidos se puede satisfacer tanto con el proceso de primarias que dispone el Art. 4.006 de la Ley Electoral, así como por alguno de los métodos alternos de selección de candidatos, según los contempla el Art. 4.007 de la referida ley, 16 L.P.R.A. sees. 3156 y 3156a. Véase, además, D.Grimm, Los partidos políticos, pág. 411.